**STANFORD RANCH, INC., a California corporation, Plaintiff–Appellant,**

v.

**MARYLAND CASUALTY COMPANY, Defendant–Appellee.**

No. 95–15549.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 13, 1996.

Decided July 15, 1996.

Patrick Markham, Law Offices of Patrick Markham, Sacramento, California, for plaintiff-appellant.

James C. Nielsen, Wright, Robinson, McCammon, Osthimer & Tatum, San Francisco, California, for defendant-appellee.

* Honorable James M. Burns, Senior United States District Judge for the District of Oregon, sitting by designation.

Before: T. G. NELSON and TASHIMA, Circuit Judges, and BURNS,* District Judge.

## OPINION

T.G. NELSON, Circuit Judge:

Stanford Ranch, Inc., ("Stanford") brought suit against Maryland Casualty Company and Northern Insurance Company of New York[1] (collectively "Maryland") claiming breach of insurance contracts and breach of the implied covenant of good faith and fair dealing. The parties cross-moved for summary judgment, and the district court granted the motion in favor of Maryland and denied the motion of Stanford. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

## FACTS AND PROCEDURAL HISTORY

### A. The Underlying Lawsuits

Stanford is a developer of a master-planned community in Rocklin, California. Stanford, acting as master developer, subdivides the development and sells large tracts of land to other developers ("sub-developers") for separate development. Three such sub-developers, Prudential Development Company, Centex Real Estate Corporation and Covington Homes, Northern California (collectively "claimants"), filed actions in state court against Stanford ("underlying lawsuits"). All three underlying lawsuits allege actions for specific performance, breach of contract, intentional misrepresentation, negligent misrepresentation and nondisclosure.

### 1. Prudential Development Action

According to the fourth amended complaint in *Prudential Development Co. v. Stanford Ranch, Inc.,* Placer County Superior Court No. 83239, in April of 1988, Prudential entered into an agreement for the

1. Maryland Casualty Company and the Northern Insurance Company of New York are both members of The Maryland Insurance Group.

purchase and sale of real property in the Stanford Ranch Development, identified as Parcel 17, Phase II ("purchase property"). The agreement requires Stanford to use its best efforts to secure governmental approvals of "(a) a lawful land-division which would create a legal parcel for recordation and transfer of legal title to PRUDENTIAL, and (b) a permit from the Army Corps of Engineers authorizing the filling of wetlands on the development property pursuant to Section 404 of the Clean Water Act (33 USC 1344)." If Stanford's best efforts did not result in the necessary approvals by July 15, 1988, the closing date of escrow would be extended.

The complaint alleges that both before and after the agreement was entered into, Stanford represented to Prudential that it would be able to obtain the necessary governmental approvals by the July 15 deadline.

On May 13, 1988, Prudential and Stanford entered into an amendment to the purchase agreement which requires Stanford to deliver a preliminary title report regarding the purchase property within five days of recordation of the final parcel map. Prudential alleges that escrow is not to close until this title report is delivered.

Prudential's complaint also alleges a series of misrepresentations and concealments with respect to the original agreement relating to the wetlands permits. Prudential claims that Stanford filled in a portion of wetlands on the Stanford Ranch Development in violation of Section 404 of the Clean Water Act before the agreement was entered into;[2] that Stanford misrepresented the amount of wetlands subject to application for a Section 404 permit; and that Stanford knew or should have known that it could not obtain a permit from the United States Army Corps of Engineers ("Corps") by the July 15 closing date due to its unauthorized and undisclosed filling of the wetlands.

Stanford advised Prudential for the first time, in a letter dated June 3, 1988, that it "might not be able to obtain the needed governmental approvals by July 15, 1988," and "that it was unable to close escrow because of 'unanticipated' demands caused by the City of Rocklin."

Prudential claims that on June 30, 1988, Stanford advised Prudential that "the Section 404 permit had been issued and would be received 'momentarily.'" However, Prudential alleges that on July 5, 1988, Stanford informed Prudential that, "in fact, no Section 404 permit had issued. STANFORD then assured PRUDENTIAL that everything would still work out and that PRUDENTIAL should not worry because STANFORD would still honor the Agreement."

Prior to the July 15 closing date, Stanford proposed an extension of closing to August 15, which "the parties ultimately extended to November 15, 1988." When the parties attempted to put the extension in writing, Prudential alleges that "STANFORD insisted that PRUDENTIAL agree to a number of material modifications," including "elimination of any duty on STANFORD's part to obtain the governmental approvals, and elimination of the Amendment extending the close of escrow for STANFORD's delivery of the preliminary title report to PRUDENTIAL." Prudential refused to modify the agreement as requested.

On September 30, 1988, Stanford sent a letter to Prudential stating that Stanford was terminating the agreement. Prudential alleges that Stanford's motive for repudiating the agreement was to force Prudential "to renegotiate the purchase and sale of the Purchase Property at a price more favorable to STANFORD, or to put the property back on the market at a higher price."

Based on the foregoing, Prudential asserts claims for specific performance; declaratory relief regarding Stanford's continuing obligation to perform under the contract; breach of contract; breach of the covenant of good faith and fair dealing; intentional misrepresentation; negligent misrepresentation; and nondisclosure.

---

**2.** Stanford admits that it filled in at least one "seep" between May and August of 1987. In February of 1988, the United States Army Corps of Engineers informed Stanford that its activities

during the period of May through November of 1987 violated Section 404 of the Clean Water Act.

### 2. *Centex Real Estate Action*

According to the third amended complaint in *Centex Real Estate Corp. v. Stanford Ranch, Inc.*, Placer County Superior Court No. 83221, Centex entered into a written sales contract with Stanford on or about January 22, 1988, for the purchase of real property known as Parcel 11, Phase II, of the Stanford Ranch Development ("purchase property"). Under the agreement, Stanford is required to use "good faith and due diligence to obtain approval of a tentative subdivision map ('tentative map') for the property from the City of Rocklin by July 1, 1988." If Stanford "failed to diligently process the tentative map for approval, [Centex] had the option to extend the closing to at least January 1, [1989,] by giving written notice of such extension to Stanford Ranch on or before July 11, 1988."

Centex alleges that Stanford became aware in or about March 1987 that its Phase II project contained wetlands falling under the jurisdiction of the Army Corps of Engineers, "and that prior to the filling of wetlands and development of the property, an appropriate permit would need to be obtained pursuant to Section 404 of the Clean Water Act." Centex also alleges that Stanford was aware that it had to obtain this permit before it could obtain a large parcel map and sell the property.

Centex alleges that by June 1987, Stanford was aware that it had filled in wetlands in violation of Section 404 and that it needed to obtain an appropriate permit from the Corps. Centex also alleges that from November 1987, until the contract was entered into on January 22, 1988, Stanford "failed to disclose, actively concealed, and misrepresented these facts to [Centex]. . . ."

In or about January 1988, the Corps discovered that Stanford had been filling in wetlands unlawfully and without the required Section 404 permit. In or about February 1988, the Corps issued a cease and desist order to prevent further impact on the wetlands.

Stanford disclosed to Centex for the first time on June 3, 1988, that it might not be able to obtain the needed approvals in order to close escrow by July 1, 1988, due to "unanticipated demands by the City of Rocklin." On June 29, 1988, Centex extended the closing date to December 30, 1988. However, on July 6, 1988, Stanford allegedly repudiated the agreement. On August 4, 1988, and September 22, 1988, Centex alleges that it communicated to Stanford that the contract remained valid. Stanford refused to modify its position.

Based on the foregoing, Centex asserts claims for specific performance; breach of contract; breach of implied covenant of good faith and fair dealing; negligent misrepresentation; intentional misrepresentation; and material nondisclosure.

### 3. *Covington Homes Action*

According to the fifth amended complaint in *Covington Homes, Northern California v. Stanford Ranch, Inc.*, Placer County Superior Court No. 83185, Covington and Stanford entered into a written agreement for the purchase and sale of Parcel 12, Phase II, of the Stanford Ranch Development ("purchase property") on May 26, 1987. The escrow was originally scheduled to close on August 3, 1987. From time-to-time, Covington exercised its right under the agreement to extend the closing date.

On November 19, 1987, Covington and Stanford modified the agreement, to require Stanford to "comply, if required, with Section 404 of the Clean Water Act and provide [Covington] with proof of compliance prior to the close of escrow." Stanford further warranted and covenanted in the modification "that the Purchase Property was free of wetlands and vernal pools."

Covington alleges that from May 1987 to June 1988, Stanford represented that it was diligently pursuing the Government approvals necessary to complete the sale. Covington also alleges that Stanford was subject to a cease-and-desist order from the Corps in February 1988. On or about June 3, 1988, Stanford repudiated the purchase agreement.

Based on the foregoing, Covington asserts claims for specific performance; breach of contract; intentional misrepresentation; negligent misrepresentation; and nondisclosure.

B. *The Insurance Policies*

There are two relevant policies at issue in this case-the primary policy issued by Maryland for the policy period August 1, 1986, to August 1, 1988, and the umbrella policy issued by Maryland for the same period.[3] The primary policy provides:

II. PERSONAL INJURY AND ADVERTISING INJURY LIABILITY COVERAGE

(A) The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of personal injury or advertising injury to which this insurance applies, sustained by any person or organization and arising out of the conduct of the named insured's business, within the policy territory, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such injury....

(B) The insurance does not apply:

....

(6) to advertising injury arising out of

(a) failure of performance of contract, but this exclusion does not apply to the unauthorized appropriation of ideas based upon alleged breach of implied contract....

....

(D) Additional Definitions

"Advertising Injury" means injury arising out of an offense committed during the policy period occurring in the [ ] course of the named insured's advertising activities, if such injury arises out of libel, slander, defamation, violation of right of privacy, piracy, unfair competition, or infringement of copyright, title or slogan.

"Personal Injury" means injury arising out [of] one or more of the following offenses committed during the policy period:

....

(2) wrongful entry or eviction or other invasion of the right of private occupancy....

The umbrella policy's insuring agreement states:

3.1 COVERAGES. The Company will pay on behalf of the Insured for ultimate net loss in excess of the retained limit which the Insured by reason of liability imposed upon the Insured by law or assumed by the Insured under any contract or agreement, shall become legally obligated to pay as damages because of Personal Injury Liability or Property Damage Liability or Advertising Offense Liability to which this policy applies, caused by an occurrence.

The umbrella policy provides the following definitions:

2.1 "Advertising Offense" means libel, slander, defamation, infringement of copyright or of title or of slogan, piracy, unfair competition, idea misappropriation or invasion of rights of privacy committed or alleged to have been committed during the policy period, arising out of the Insured's advertising activities.

....

2.9 "Personal Injury" means any of the following acts or offenses which occur during the policy period, including death and care and loss of service resulting therefrom:

....

(d) wrongful entry or eviction, or other invasion of the right of private occupancy....

Coverage is excluded under the umbrella policy "with respect to advertising offense, to damages resulting from (a) breach of contract other than an implied contract to pay for the misappropriation of an idea."

C. *Procedural History*

After the underlying lawsuits were brought, Stanford tendered its defense and indemnity to Maryland. Maryland denied coverage under the insurance policies and

---

**3.** Although Stanford's suit against Maryland involved several additional policies, Stanford appeals only the grant of summary judgment as to these two policies.

refused to defend the lawsuits. Stanford brought suit against Maryland in Sacramento County Superior Court seeking damages for breach of the insurance contracts and breach of the implied covenant of good faith and fair dealing. The case was removed by Maryland to the United States District Court for the Eastern District of California based on diversity jurisdiction.

In the district court, the parties cross-moved for summary judgment. The district court granted Maryland's motion for summary judgment, holding that there was no potential for coverage under the policies. Therefore, the district court held, Maryland did not owe a duty to defend the underlying lawsuits against Stanford.[4]

## STANDARD OF REVIEW

■ A grant of summary judgment is reviewed *de novo*. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir.1995), *cert. denied*, ⸺ U.S. ⸺, 116 S.Ct. 1261, 134 L.Ed.2d 209 (1996). "Because this action was removed to federal district court under diversity jurisdiction, the substantive law of California, the forum state, applies." *St. Paul Fire & Marine Ins. Co. v. Weiner*, 606 F.2d 864, 867 (9th Cir.1979). We apply the same *de novo* standard of review to the district court's interpretation of state law as we do to its interpretation of federal law. *Matter of McLinn*, 739 F.2d 1395, 1398 (9th Cir.1984).

■ The interpretation of an insurance policy is a question of law. *Fragomeno v. Insurance Co. of the West, Inc.*, 207 Cal. App.3d 822, 255 Cal.Rptr. 111, 114 (1989). Thus, "it is the duty of the appellate court to make its own independent determination of the meaning of the language used in the contract under consideration." *Id.* (quotations and ellipses omitted).

## ANALYSIS

The sole question before us is whether Maryland had a duty to defend the underlying lawsuits brought against Stanford. We

hold that no duty to defend arose. The district court's grant of summary judgment for Maryland is therefore affirmed.

■ Under California law, an insurer has a duty to defend its insured against third-party suits "when the policy is ambiguous and the insured would reasonably expect coverage based on the nature and kind of risk covered by the policy" or where "the underlying suit potentially seeks damages within the coverage of the policy." *La Jolla Beach and Tennis Club, Inc. v. Industrial Indemnity Co.*, 9 Cal.4th 27, 36 Cal.Rptr.2d 100, 105, 884 P.2d 1048, 1053 (1994), *as modified* (1995) (quotations and citations omitted).

■ Although an insurer's duty to defend is broader than its duty to indemnify, "it is not absolute." *Keating v. National Union Fire Ins. Co. of Pittsburgh, Pa.*, 995 F.2d 154, 156 (9th Cir.1993). The duty to defend an action is not "triggered by the prospect that the insured may face a claim for materially different relief in some other action brought in a distinctly different forum, merely because the two actions are premised on similar factual allegations." *La Jolla Beach*, 36 Cal.Rptr.2d at 109, 884 P.2d at 1057. Instead, "the test is whether the underlying action for which defense and indemnity is sought potentially seeks relief within the coverage of the policy." *Id.*

A. *The Policies' Insuring Agreements Cover Only Tort, and Not Contract, Liability*

■ The two policies at issue in the present case provide coverage only for those sums which the insured becomes "legally obligated to pay as damages . . . ." California courts have consistently interpreted this language to cover only tort liabilities and not those liabilities arising in contract. *See Insurance Co. of the West v. Haralambos Beverage Co.*, 195 Cal.App.3d 1308, 241 Cal.Rptr. 427, 430 (1987); *Fireman's Fund Ins. Co. v. City of Turlock*, 170 Cal.App.3d 988, 216 Cal.Rptr. 796, 800 (1985); *International Surplus Lines Ins. Co. v. Devonshire Coverage*

---

4. The district court's decision is published at *Stanford Ranch, Inc. v. Maryland Casualty Co.*, 883 F.Supp. 493 (E.D.Cal.1995).

*Corp.,* 93 Cal.App.3d 601, 155 Cal.Rptr. 870, 875 (1979); *Chamberlain v. Allstate Ins. Co.,* 931 F.2d 1361, 1365 (9th Cir.1991). Thus, Maryland owes a duty to defend the underlying lawsuits only if the claims against Stanford are based on tort liability.

■ If a claim is dependent upon the existence of an underlying contract, the claim sounds in contract, as opposed to tort. *Haralambos,* 241 Cal.Rptr. at 430–31 (liability is purely contractual where liability depends upon the existence of a contract); *City of Turlock,* 216 Cal.Rptr. at 800 (same). This distinction between contract and tort liability is demonstrated in *Allstate Ins. Co. v. Hansten,* 765 F.Supp. 614 (N.D.Cal.1991).

In *Hansten,* the insured sold a house to the Wedekinds. *Id.* at 615. A dispute arose concerning disclosure issues, and the Wedekinds sued on both contract and tort theories. *Id.* The insurance policy at issue did not cover liability based on breach of a contractual duty. *Id.* at 616. In holding that a cause of action for negligence was not covered under the policy, the court explained:

> Although this [negligence] claim does not refer to the Hanstens' contractual duties, the alleged harm could not have been realized without the contract to sell the house. Without the contract, the Hanstens would have had no duty of care towards the Wedekinds. Therefore, the duty alleged to have been breached was a contractual duty, and the policy does not cover such losses.

*Id.*

■ In the present case, the underlying lawsuits alleged claims based on breach of contract, negligent and intentional misrepresentation, and nondisclosure. Liability for all of these claims depends upon the existence of the underlying purchase agreements because without the purchasing agreements, Stanford would not have a duty of care towards the claimants. The liability in the underlying lawsuits is therefore purely contractual and not covered under the insurance policies. *See Haralambos,* 241 Cal.Rptr. at 430–31.

However, Stanford cites *American States Ins. Co. v. Canyon Creek,* 786 F.Supp. 821 (N.D.Cal.1991), in support of its claim that the "personal injury" coverage should extend to the underlying lawsuits.

In *Canyon Creek,* purchasers of mobile homes brought suit against the insured alleging that the insured "knowingly or negligently made false statements in connection with the sale of manufactured housing that materially affected the value of [the purchasers'] bargain." 786 F.Supp. at 824. The purchasers alleged that due to the misrepresentations, "they were led to believe that they would have the right to own and occupy the real property on which their mobile homes were located." *Id.* at 829. The purchasers in fact were not allowed to own and occupy the real property.

The insurance policy in that case provided coverage for sums which the insured became legally obligated to pay as damages because of personal injury caused by an "occurrence." *Id.* at 824. Personal injury was defined as including injury arising out of "wrongful entry or eviction or other invasion of the right of private occupancy...." *Id.* (alterations omitted).

In determining whether the claims were included within the liability for "personal injury" provision, the court acknowledged that the policy language restricted coverage to tort liability only. *Id.* at 828. However, the court determined that because the misrepresentation claims were framed as fraud or negligent misrepresentation claims rather than as contract claims, the claims sounded in tort rather than contract. Therefore, the court held the claims fell within the "personal injury" liability coverage of the policy and the insurer owed a duty to defend.

We decline to follow *Canyon Creek* because the case goes against, and in fact ignores, the strong line of California authority that a claim dependent on the existence of an underlying contract sounds in contract, as opposed to tort. *See Haralambos,* 241 Cal. Rptr. at 430–31; *City of Turlock,* 216 Cal. Rptr. at 800.

We hold that liability in the underlying lawsuits in the present case is dependent upon the existence of the underlying contracts. Liability is therefore contract based

and is not covered by the insurance policies. Maryland does not have a duty to defend the underlying lawsuits.

### B. *The Personal Injury Insuring Agreement is not Ambiguous*

Stanford contends that the language of the Maryland policies is ambiguous in two ways. First, Stanford claims that the exclusion from coverage of "failure of a contract" causing advertising injury creates an ambiguity in that "[t]he exclusion is meaningless unless the insuring agreement initially provided coverage for contractual liability causing personal injury and advertising injury." Second, Stanford claims that an "ambiguity was created because the personal injury coverage was inherently contractual, but the insuring agreement has been interpreted to limit coverage to torts." We reject both of these claims.

The rules regarding interpretation of insurance contracts in California are well settled. The words of the policy are to be interpreted according to their ordinary meaning, "i.e., according to the plain meaning which a layperson would ordinarily attach to them." *Chatton v. National Union Fire Ins. Co. of Pittsburgh, Pa.*, 10 Cal.App.4th 846, 13 Cal.Rptr.2d 318, 322 (1992). "If the meaning a layperson would ascribe to the contract language is not ambiguous, there is no place for interpretation and the court must simply apply that meaning." *Id.*

However, if the language of the policy is ambiguous, the ambiguity "is resolved by interpreting the ambiguous provisions in the sense [the insurer] believed the [insured] understood them at the time of formation." *AIU Ins. Co. v. FMC Corp.*, 51 Cal.3d 807, 274 Cal.Rptr. 820, 831, 799 P.2d 1253, 1264 (1990). Application of this rule "protects not the subjective beliefs of the insurer but, rather, the objectively reasonable expectations of the insured." *Bank of the West v. Industrial Indem. Co.*, 2 Cal.4th 1254, 10 Cal.Rptr.2d 538, 545, 833 P.2d 545, 552 (1992). "Only if this rule does not resolve the ambiguity do we then resolve it against the insurer." *Id.*

In applying the above rules of contract interpretation, this court must interpret the language of the contract in context, "with regard to its intended function in the policy. This is because language in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract." *Id.* (citations and quotations omitted).

#### 1. *Advertising Injury Exclusion*

Stanford claims that the primary policy "is ambiguous when applied to a claim for contract liability that allegedly interferes with the right to possess property." In support of this claim, Stanford points to the policies' exclusion of "advertising injury arising out of failure of performance of contract...." Stanford contends that because the contract exclusion applies to advertising injury only, "personal injury arising out of failure of performance of contract must remain covered." We are not persuaded.

First, Stanford is claiming that there is a duty to defend based on the policies' personal injury provision. It is not claiming coverage under the advertising injury provision. Thus, the advertising injury exclusions are inapplicable and unrelated to the personal injury provision under which Stanford is claiming a duty to defend exists.

Second, Stanford is attempting to use a policy exclusion to expand the policies' insuring agreement. It is well established in California that an exclusion cannot act as an additional grant or extension of coverage. *See St. Paul Fire & Marine Ins. Co. v. Coss*, 80 Cal.App.3d 888, 145 Cal.Rptr. 836, 840–841 (1978) (provision excluding "liability assumed by the Insured under any contract or agreement except an incidental contract; but this exclusion does not apply to a warranty of fitness or quality ... or a warranty [that work will be performed in a workmanlike manner]" cannot act to grant or extend additional coverage); *Fresno Economy Import Used Cars, Inc. v. United States Fidelity & Guar. Co., Inc.*, 76 Cal.App.3d 272, 142 Cal. Rptr. 681, 687 (1977) (provision excluding "liability assumed by the Insured under any contract or agreement except an incidental contract; but this exclusion does not apply to

a warranty of fitness" did not expand insuring agreement to cover contractual warranty claims). In interpreting an insurance contract, this court must first look to the insuring agreement and determine whether coverage exists. If coverage exists, then this court must look to the contract exclusions to see if coverage is otherwise excluded. If coverage does not exist under the insuring agreement, the inquiry is at an end. There is no need to look to the exclusions because they cannot expand the basic coverage granted in the insuring agreement. *See St. Paul Fire,* 145 Cal.Rptr. at 840–841.

The insuring agreement in the present case covers only liability arising in tort. Thus, there is no coverage for liability arising in contract. There is no need to examine the advertising injury exclusion, because this exclusion cannot be used to extend or grant additional coverage for personal injury arising in contract. *See id.*

2. *Personal Injury Coverage*

Stanford claims that the personal injury coverage is ambiguous in that the definitions in the policy create "an internal inconsistency that renders the policy self-defeating." We reject this claim.

In *Fragomeno v. Insurance Company of the West, Inc.,* 255 Cal.Rptr. at 113, the underlying lawsuit was an unlawful detainer action against the insured. The insurance policy provided coverage only for those sums "which the insured shall become legally obligated to pay as damages because of [personal] injury. . . ." *Id.* Personal injury was defined in the policy as injury arising out of "wrongful entry or eviction, or other invasion of the right of private occupancy." *Id.* Based on these provisions, the court held that the insurer was "obligated to defend and indemnify the [insured] for any act constituting an invasion of the right of private occupancy which incurs *tort liability as opposed to contract liability.*" *Id.* 255 Cal.Rptr. at 114 (emphasis added).

The court stated that in determining whether the underlying lawsuit "sounds in contract or in tort the gravamen of the facts giving rise to the right to recovery must be examined." *Id.* 255 Cal.Rptr. at 116. If the

right arises from the breach of a lease provision occurring while the lease was still in effect, then the right has its inception in contract. *Id.* On the other hand, if the right is "based upon a civil wrong such as possession of property by a trespasser ab initio, or by a holdover tenant as a resulting trespasser, or by an encroacher then the right . . . has its inception in tortious conduct." *Id.* Because the right to possession emanated from the breach of a lease while the lease was still in effect, the court held that the underlying lawsuit was based in contract and that the insurance policy did not give rise to a duty to defend. *Id.* 255 Cal.Rptr. at 117.

The relevant language of the policies in the present case is identical to that in *Fragomeno.* Thus, under *Fragomeno,* a claim for personal injury arising out of "wrongful entry or eviction, or other invasion of the right of private occupancy" is covered only if it sounds in tort. As previously stated, liability in the underlying lawsuits is premised on the existence of the purchase agreements. The underlying lawsuits therefore sound in contract, as opposed to tort, and are not covered under the policy.

Stanford claims that reliance on *Fragomeno* is misplaced because that case neither addressed, nor resolved, the ambiguity issue. We disagree.

The parties' agreement in *Fragomeno* that the policy covered only tort as opposed to contract liability is not significant because, as the court noted, it was well established in California that the policy's "legally obligated to pay" language limited coverage to tort liability. 255 Cal.Rptr. at 114. Furthermore, when a policy's insuring agreement provides coverage only for those sums the insured becomes "legally obligated to pay," the solid line of California authority restricts coverage to tort liability without reference to the individual policy language in dispute. *See Haralambos,* 241 Cal.Rptr. at 430; *Turlock,* 216 Cal.Rptr. at 800; *Devonshire,* 155 Cal.Rptr. at 875; *Chamberlain,* 931 F.2d at 1365.

Stanford's reliance on *Martin Marietta Corp. v. Insurance Co. of North America,* 40 Cal.App.4th 1113, 47 Cal.Rptr.2d 670 (1995)

is misplaced. In *Martin Marietta*, the issue was whether policy language insuring Martin Marietta's liability for "wrongful entry or eviction, or other invasion of the right of private occupancy" provided coverage for actions brought by the Government which sought to require Martin Marietta to remediate groundwater and other contamination emanating from the landfill and other sites. *Id.* 47 Cal.Rptr.2d at 672. There was no contract at issue in the case. Instead, the action was based upon alleged violations of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §§ 9601 *et seq.* ("CERCLA"), the Resource, Conservation and Recovery Act, 42 U.S.C. §§ 6901 *et seq.* ("RCRA"), and similar statutes and theories.

After reviewing California case law, the court concluded:

> [U]nder California law, the language "wrongful entry or eviction, or other invasion of the right of private occupancy" is limited to *tort claims* relating to the invasion of an interest in real property.... [P]ersonal injury coverage is not determined by the nature of the damages sought in the action against the insured, but by the nature of the claims made against the insured in that action.

*Id.* 47 Cal.Rptr.2d at 677 (emphasis added).

The court held that the policy term "other invasion of the right of private occupancy" was ambiguous and therefore must be construed against the insurer. *Id.* 47 Cal. Rptr.2d at 681.

▆ In the present case, in contrast to *Martin Marietta*, all of the claims in the underlying lawsuits are based upon and dependent upon the existence of a contract. Without a contract, there would be no basis for the claims. The underlying claims are therefore contract claims, not tort claims. The "other invasion of the right of private occupancy" language does not change this result.

Furthermore, the "other invasion of the right of private occupancy" language is limited to tort claims. *Id.* 47 Cal.Rptr.2d at 677. Because the underlying lawsuits do not con-

tain any tort claims, the language "other invasion of the right of private occupancy" is inapplicable and cannot be construed to impose a duty to defend upon Maryland. *See id.*

Stanford also contends that the policy cannot cover "wrongful eviction of a tenant or purchaser which is always a breach of contract" and at the same time "forbid[ ] coverage for *any* breach of contract." Therefore, Stanford claims that the policy is ambiguous. We are not persuaded.

▆ The policy defines personal injury as including "wrongful entry or eviction or other invasion of the right of private occupancy." Wrongful entry clearly refers to torts in the nature of trespass. *Fibreboard Corp. v. Hartford Acc. & Indem. Co.*, 16 Cal.App.4th 492, 20 Cal.Rptr.2d 376, 388 (1993). Although wrongful eviction can refer to eviction of a tenant or purchaser and be based in contract, it can also refer to an action that is not based in contract as, for example, the eviction of a trespasser. *See, e.g., Frank v. Kizer*, 213 Cal.App.3d 919, 261 Cal.Rptr. 882, 885 (1989) (hospital threatened to evict a patient as a "trespasser"); *King v. Oakmore Homes Ass'n.*, 195 Cal.App.3d 779, 241 Cal.Rptr. 140, 143 (1987) (co-tenant's right to evict a trespasser); *Kohler v. Bristow*, 131 Cal.App.2d 692, 281 P.2d 352, 355 (1955) (trespassers evicted by landowner).

Just as one can be liable for tortiously entering property, as in trespass, one can also be liable for tortiously evicting another from property if the other had some right to be there. Thus, Stanford's claim that wrongful eviction is always a breach of contract and that the policy contains an inherent ambiguity fails.

## C. *The Existence of Claims Independent of the Contract*

▆ Stanford claims that each of the claimants stated facts necessary to support a citizen-suit based on violations of the Clean Water Act ("Act") and independent of the contract and therefore the lawsuits are really tort cases.[5] We reject this claim.

**5.** Stanford also claims, for the first time in its

reply brief, that Maryland has a duty to defend

There is no evidence that the sub-developers would have, or could have, brought suit under the Act. Standing exists for a citizen to sue under the Act only if it can establish that it " 'personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant....' " *Save Our Community v. United States E.P.A.*, 971 F.2d 1155, 1160 (5th Cir.1992) (quoting *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982)). Moreover, a citizen's right to bring suit under the Act is limited and "may not be brought if appropriate federal or state regulatory agencies have undertaken their own enforcement action to correct a violation." *Saboe v. State of Oregon*, 819 F.Supp. 914, 916 (D.Or.1993).

In the present case, there is no evidence that the sub-developers had standing to bring a citizen's suit for the alleged violations of the Act. Nor is there any evidence that the Corps' cease and desist and remediation orders to Stanford were inadequate. Thus, there is no evidence that Stanford could have been sued under the Act.

Furthermore, although each sub-developer alleged that Stanford violated the Act by filling wetlands, the violation of the Act was not the basis of the suits. The suits were based on Stanford's breach of contract. Stanford's speculation that the complaints could have been amended to state a claim under the Act is insufficient to create a potential for coverage. *See Hurley Constr. Co. v. State Farm Fire & Casualty Co.*, 10 Cal. App.4th 533, 12 Cal.Rptr.2d 629, 631 (1992) ("[T]he insured may not speculate about unpled third party claims to manufacture coverage.").

## CONCLUSION

Maryland did not have a duty to defend the underlying lawsuits brought against Stanford. The district court's grant of summary judgment for Maryland is therefore AFFIRMED.

---

the underlying lawsuits based on Stanford's potential vicarious liability. Although Stanford did mention vicarious liability in its opening brief's statement of facts, Stanford never argued vicarious liability as a basis for finding a duty to defend until its reply brief. Because Stanford failed to argue the vicarious liability claim in its opening brief, we deem the claim waived. *See State of Nevada v. Watkins*, 914 F.2d 1545, 1560 (9th Cir.1990), *cert. denied*, 499 U.S. 906, 111 S.Ct. 1105, 113 L.Ed.2d 215 (1991); *American Int'l Enter. v. F.D.I.C.*, 3 F.3d 1263, 1266, n. 5 (9th Cir.1993).