**CONESTOGA SERVICES CORPORATION, Plaintiff–Appellant,**

v.

**EXECUTIVE RISK INDEMNITY, INC., Defendant–Appellee.**

No. 01–16693.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 6, 2002.

Filed Nov. 27, 2002.

Lee S. Harris, Brian E. Soriano, Goldstein, Gellman, Melbostad, Gibson & Harris, LLP, Matthew Wertheim, Law Office of Matthew Wertheim, Elizabeth E. Bader,

Law Office of Elizabeth E. Bader, San Francisco, CA, for plaintiff-appellant.

Stephen L. Young, Oakland, CA, for Amici Curiae on Behald of Plaintiff/Appellant.

Robert B. Best, Jr., Husch & Eppenberger, LLP, Kansas, MO, for Amicus Curiae on Behalf of Plaintiff/Appellant.

Gilbert D. Jensen, Musick, Peeler & Garrett, LLP, Los Angeles, CA, for defendant-appellee.

Before B. FLETCHER, ARNOLD [*] and RAWLINSON, Circuit Judges.

## OPINION

BETTY B. FLETCHER, Circuit Judge.

Plaintiff-appellant Conestoga Services Corp. ("Conestoga"),[1] an insurance brokerage, sued defendant-appellee Executive Risk Indemnity, Inc. ("Executive Risk"), claiming that Executive Risk breached its liability insurance contract with Conestoga when it refused to defend Conestoga in a malpractice suit. Executive Risk maintained that it was not obliged to defend Conestoga under Conestoga's insurance policy because the policy contained an exception that precluded coverage for claims "based on or directly or indirectly arising out of or resulting from the bankruptcy of, or suspension of payments or failure or refusal, in whole or in part, to pay by . . . any self-insurance plan. . . ." The district court agreed that the exception was appli-

cable and granted summary judgment to Executive Risk on all claims.

Conestoga now appeals the district court's grant of summary judgment on its claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and declaratory judgment. We have jurisdiction under 28 U.S.C. § 1291, and now reverse in part and vacate and remand in part.

## I. BACKGROUND

### A. *The Contract*

Plaintiff-appellant Conestoga is an insurance brokerage firm. Beginning in June 1995, Conestoga entered into an insurance contract with Executive Risk whereby Executive Risk provided Conestoga with a "Specialized Insurance Agents and Insurance Brokers Professional Liability Policy" (the "Policy"). This type of policy is generally referred to as "errors-and-omissions" liability insurance; it is essentially malpractice insurance for insurance brokers.

The Policy at issue here insured Conestoga against damages and defense expenses incurred by Conestoga "for a Wrongful Act first committed on or after the Retroactive Date stated in item 6 of the Declarations." The policy defines "wrongful act" as "any actual or alleged act, error, or omission committed solely in the performance of, or failure to perform, Professional Services." "Professional Services," in turn, is defined as "only insurance services performed for others for a fee as an insurance agent, insurance broker, managing general agent, general agent, surplus lines broker, wholesale insurance broker or insurance consultant,

---

[*] The Honorable Richard S. Arnold, of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

1. The firm previously did business under the name MacCready & Gutmann. For the sake of clarity, we will refer to the firm exclusively as "Conestoga."

including notary public, premium financing, claims adjusting and loss control services"; however, the term "others" cannot include entities affiliated with the insured.

The Policy also contained various exclusion clauses. At issue in this case is Exclusion L, which provides as follows:

This Policy shall not apply to any Claim ... based on or directly or indirectly arising out of or resulting from the bankruptcy of, or suspension of payments or failure or refusal, in whole or in part, to pay by:

(1) any broker or dealer in securities or commodities, or

(2) any bank or banking firm, or

(3) any bonding company or insurance company or reinsurance company, or

(4) any self-insurance plan, insurance pool or reciprocal, captive insurance company, risk retention group or risk purchasing group.

## B. *The "Wrongful Act"*

In May 1995, the Frontier Pacific Insurance Co. ("Frontier") wrote a surety bond through Conestoga for $5,743,000. The surety bond was part of a workers' compensation self-insurance plan for a retail paint store, the Standard Brands Paint Company ("Standard"): It guaranteed the payment of Standard's workers' compensation obligations to its employees, as required under Cal. Labor Code § 3701. The obligee on the bond was the State of California; Frontier, the surety, required the paint store, as the principal on bond, to post collateral in the amount of $3,158,650.

On August 16, 1995, Standard and the Director of the Department of Industrial Relations for the State of California ("Director") agreed to reduce the amount of the bond by $1,837,728. The Director forwarded a one-page Surety Bond Decrease Rider ("Rider") to Conestoga for execu-

tion. Conestoga then forwarded the Rider to Frontier; Frontier executed it and returned it to Conestoga with directions to forward it back to the Director, so that the Director could execute the final copy. Conestoga, however, unbeknownst to Frontier, never forwarded the Rider to the Director for final execution. Meanwhile, Frontier, acting pursuant to the Rider, reduced the collateral required against the bond to $2,000,000.

In December 1995, Standard filed for bankruptcy. The Director notified Frontier, the surety, that the principal had defaulted, and requested that Frontier cover Standard's workers' compensation liabilities up to the *original* amount of the bond, on the grounds that the Rider had never been executed and thus was not valid. Frontier, maintaining that the Rider was valid, argued that it should only be obliged to pay $3,905,272—the amount of the surety bond as amended by the Rider. Although Conestoga ultimately forwarded the Rider to the Director on February 26, 1996, the Director did not change his position that the Rider was invalid.

Frontier sued Conestoga in California Superior Court on August 6, 1999, alleging breach of contract, breach of fiduciary duty, and negligence. On August 18, 1999, Conestoga tendered the defense of the Frontier lawsuit to Executive Risk, enclosing with its letter a copy of the Frontier complaint. On August 30, 1999, Executive Risk denied coverage for the Frontier lawsuit, based on the provision in Exclusion L that excluded claims "based on or directly or indirectly arising out of or resulting from the bankruptcy of, or suspension of payments or failure or refusal, in whole or in part, to pay by ... any self-insurance plan, insurance pool or reciprocal, captive insurance company, risk retention group or risk purchasing group."

### C. The Present Suit

Conestoga filed the instant lawsuit in California Superior Court, seeking damages for breach of contract, breach of the implied covenant of good faith and fair dealing, and negligence, as well as declaratory relief establishing that the Policy obligated Executive Risk to defend Conestoga in the Frontier action. The case was removed to federal court on diversity grounds on December 21, 1999. On May 11, 2001, the district court granted Executive Risk's motion for partial summary judgment, holding that Executive Risk had no duty to defend Conestoga, denying Conestoga's breach of contract and negligence claims, and rejecting its claim for declaratory relief.

In its Order, the district court agreed with Executive Risk that the Policy clearly and unambiguously excluded the Frontier suit from coverage. Exclusion L exempted from coverage claims "based on or directly or indirectly arising out of or resulting from the bankruptcy of, or suspension of payments or failure or refusal, in whole or in part, to pay by ... any self-insurance plan." Conestoga had argued that the term "self-insurance plan" applied only to insurance companies, but the district court rejected that construction, noting that it would render the explicit exemption for insurance companies in paragraph (3) redundant and unnecessary. *Conestoga Servs. Corp. v. Exec. Risk Indem., Inc.,* No. C 99–5343 SC, slip op. at 8 (N.D.Cal. May 11, 2001). Conestoga also argued that Exclusion L did not apply to the Frontier case because it excluded claims arising from the "bankruptcy of a self-insurance plan," and Standard is not a self-insurance plan, but a paint store. The district court rejected this argument as well, on the grounds that Exclusion L also covered claims based on, arising out of, or resulting from "suspension of payments or failure or refusal ... to pay by ... any self-insurance plan"; "it was the cessation of payments by Standard Brands' self-insurance plan that triggered Frontier's obligations under the bond." *Id.* at 9.

Finally, the district court noted that, under California law, negligence claims do not generally lie against insurers. *Id.* at 9–10 (citing *Sanchez v. Lindsey Morden Claims Servs., Inc.,* 72 Cal.App.4th 249, 254, 84 Cal.Rptr.2d 799 (1999); *Aceves v. Allstate Ins. Co.,* 68 F.3d 1160, 1166 (9th Cir.1995); *Aas v. Superior Court,* 24 Cal.4th 627, 643, 101 Cal.Rptr.2d 718, 12 P.3d 1125 (2000)).

Executive Risk then moved for summary judgment on the remaining claim for breach of the implied covenant of good faith and fair dealing, a motion the district court granted on July 20, 2001. Under California law, the district court observed, "an insured can not maintain a claim of breach of the covenant of good faith and fair dealing where the insurer does not have a duty to defend or indemnify." *Conestoga Servs. Corp. v. Exec. Risk Indem., Inc.,* No. C 99–5343 SC, 2001 WL 868701, at *1 (N.D.Cal. July 20, 2001) (citing *Waller v. Truck Ins. Exch., Inc.,* 11 Cal.4th 1, 36, 44 Cal.Rptr.2d 370, 900 P.2d 619 (1995); *Love v. Fire Ins. Exch.,* 221 Cal.App.3d 1136, 1151–53, 271 Cal.Rptr. 246 (1990)). Because the district court found no such duty in this case, it ruled that Conestoga's breach of covenant of good faith and fair dealing claim was untenable. Accordingly, summary judgment was entered in favor of the defense on all claims. This appeal followed.

## II. STANDARD OF REVIEW

A grant of summary judgment is reviewed de novo. *See Clicks Billiards, Inc. v. Sixshooters, Inc.,* 251 F.3d 1252, 1257 (9th Cir.2001). "Because this action was removed to federal district court un-

der diversity jurisdiction, the substantive law of California, the forum state, applies." *Stanford Ranch, Inc. v. Maryland Cas. Co.*, 89 F.3d 618, 624 (9th Cir.1996) (quoting *St. Paul Fire & Marine Ins. Co. v. Weiner*, 606 F.2d 864, 867 (9th Cir.1979)) (internal quotation marks omitted). The same de novo standard of review applies to the district court's interpretation of state law as to its interpretation of federal law. *Stanford Ranch*, 89 F.3d at 624 (citing *Matter of McLinn*, 739 F.2d 1395, 1398 (9th Cir.1984)).

■ Because the interpretation of an insurance policy is a question of law, this Court must make its own independent determination of the meaning of the relevant contract language. *Stanford Ranch*, 89 F.3d at 624 (citing *Fragomeno v. Ins. Co. of the West, Inc.*, 207 Cal.App.3d 822, 827, 255 Cal.Rptr. 111 (1989)).

### III. DISCUSSION

On appeal, Conestoga's principal argument is one that it raised below, but that the district court did not address explicitly in either of its dispositive orders: Its claim for defense coverage does not "arise out of" the insolvency of a self-insurance plan, but, rather, out of a malpractice claim against Conestoga based on Conestoga's failure to forward the Rider to the Director. Conestoga argues that the Frontier suit is precisely the kind of claim that errors-and-omissions insurance is intended to cover, and, further, that no rational insurance broker would ever enter into an insurance contract of this kind if it believed that these kinds of claims would not be covered. (This is the principal concern of the amici curiae as well.) Thus, Conestoga's arguments about "arising out of" fall into two basic categories: (1) Exclusion L is ambiguous as applied to the Frontier claim, and that ambiguity should be resolved in Conestoga's favor; and (2) Exclu-

sion L and the "insolvency exception" cases are inapposite here because the Frontier claim stems from Conestoga's malpractice, not Standard's insolvency.

■ As the California Supreme Court has observed, "[w]hile insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply." *La Jolla Beach & Tennis Club, Inc. v. Indus. Indem. Co.*, 9 Cal.4th 27, 37, 36 Cal.Rptr.2d 100, 884 P.2d 1048 (1995) (citations omitted). With insurance contracts, then, as with all others, "[t]he fundamental goal of contractual interpretation is to give effect to the mutual intent of the parties." *Id.* (citations omitted).

■ Nonetheless, there are certain presumptions that California law applies in cases involving insurance contracts—and, more specifically, those involving the duty to defend. "In interpreting an insurance policy we apply the general principle that doubts as to meaning must be resolved against the insurer and that any exception to the performance of the basic underlying obligation must be so stated as clearly to apprise the insured of its effect." *Gray v. Zurich Ins. Co.*, 65 Cal.2d 263, 269 & n. 3, 54 Cal.Rptr. 104, 419 P.2d 168 (1966) (en banc); *see also* Cal. Civ.Code § 1654 ("In cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist."); *La Jolla Beach & Tennis Club*, 9 Cal.4th at 37, 36 Cal.Rptr.2d 100, 884 P.2d 1048 (1995) (when asserted ambiguity is not eliminated by the language and context of the policy, courts construe ambiguities against the party who caused the uncertainty to exist). Thus, "when the policy is ambiguous and the insured would reasonably expect coverage based on the nature and kind of risk cov-

ered by the policy," or when "the underlying suit potentially seeks damages within the coverage of the policy," the California courts have held that an insurer has a duty to defend its insured against third-party lawsuits. *Stanford Ranch,* 89 F.3d at 624 (quoting *La Jolla Beach & Tennis Club,* 9 Cal.4th at 38, 36 Cal.Rptr.2d 100, 884 P.2d 1048); *see also Montrose Chemical Corp. of Cal. v. Superior Court,* 6 Cal.4th 287, 295–96, 24 Cal.Rptr.2d 467, 861 P.2d 1153 (1993) (en banc) ("The insured's desire to secure the right to call on the insurer's superior resources for the defense of third party claims is, in all likelihood, typically as significant a motive for the purchase of insurance as is the wish to obtain indemnity for possible liability. As a consequence, California courts have been consistently solicitous of insureds' expectations on this score.") (citations omitted). An insurance policy is ambiguous "when it is capable of two or more constructions, both of which are reasonable." *La Jolla Beach & Tennis Club,* 9 Cal.4th at 37, 36 Cal.Rptr.2d 100, 884 P.2d 1048 (citations omitted).

■ For the most part, the language of Exclusion L seems fairly clear and quite broad: In relevant part, it denies coverage for claims "based on or directly or indirectly arising out of or resulting from the bankruptcy of, or suspension of payments or failure or refusal, in whole or in part, to pay by ... any self-insurance plan." Conestoga argues, however, that the terms "based on or directly or indirectly arising out of or resulting from" are ambiguous as applied to its claim, because it is unclear how direct or indirect the causal link must be between the bankruptcy/suspension of payments/failure to pay, on the one hand, and the conduct giving rise to the claim, on the other.

No one in this case disputes that Standard went bankrupt and that it defaulted on its bond. (Conestoga disputes whether

Standard—or its plan—qualifies as a "self-insurance plan" within the meaning of Exclusion L, but the district court properly rejected this argument.) The question, then, as Conestoga points out, boils down to one of proximate cause: At some point back in the causal chain, the Frontier claim did "directly or indirectly arise out of or result from" Standard's bankruptcy, but it also arose out of/resulted from Conestoga's botched handling of the Rider.

The California Supreme Court has had occasion to address the assessment of multiple causes for the purpose of determining coverage under a liability insurance contract. In *Garvey v. State Farm Fire & Cas. Co.,* 48 Cal.3d 395, 257 Cal.Rptr. 292, 770 P.2d 704 (1989) (en banc), the court explained the doctrine governing the assessment of causation under two different scenarios. The first scenario is one where there are two different causes that work together to create the loss for which coverage was claimed. Thus, for example, in *Sabella v. Wisler,* 59 Cal.2d 21, 27 Cal. Rptr. 689, 377 P.2d 889 (1963), a building contractor constructed a house on uncompacted fill and negligently installed a sewer line. Negligent installation was a covered peril; subsidence was an exception. When the sewer line eventually ruptured and the insureds sued their insurer, the California Supreme Court held that the "efficient proximate cause" standard applied:

> [I]n determining whether a loss is within an exception in a policy, where there is a concurrence of different causes, the efficient cause—the one that sets others in motion—is the cause to which the loss is to be attributed, though the other causes may follow it, and operate more immediately in producing the disaster.

*Garvey,* 48 Cal.3d at 402, 257 Cal.Rptr. 292, 770 P.2d 704 (quoting *Sabella,* 59

Cal.2d at 31–32, 27 Cal.Rptr. 689, 377 P.2d 889).

The second scenario the *Garvey* court addressed involved multiple causes that operated totally independently of one another. In *State Farm Mut. Auto. Ins. Co. v. Partridge,* 10 Cal.3d 94, 109 Cal.Rptr. 811, 514 P.2d 123 (1973), the insured was hunting jackrabbits at night from his car, using a gun that he had modified to create a "hair-trigger" action. His homeowner's liability policy covered liability resulting from the gun modification, but not losses arising out of the use of a motor vehicle. When the insured's gun accidentally discharged and injured a passenger, and the passenger sued the insured, the California Supreme Court had this to say about causation:

> Although there may be some question whether either of the two causes in the instant case can be properly characterized as *the* "prime," "moving" or "efficient" cause of the accident we believe that *coverage under a liability insurance policy* is equally available to an insured whenever an insured risk constitutes simply *a* concurrent proximate cause of the injuries.

*Garvey,* 48 Cal.3d at 405, 257 Cal.Rptr. 292, 770 P.2d 704 (quoting *Partridge,* 10 Cal.3d at 104–05, 109 Cal.Rptr. 811, 514 P.2d 123) (emphasis in original).

Regardless of which analogy one finds more compelling, the *Garvey* court's analysis suggests that the Frontier suit should have been covered. As discussed above, the Frontier suit was a malpractice suit against Conestoga, where Frontier was seeking damages equal to the difference between the amount it would have owed on the bond if Conestoga had forwarded the Rider properly and the amount it owed under the terms of the surety agreement *without* the Rider. It is not as if, for example, Frontier were suing Conestoga

on the grounds that the Standard surety bond was a poor risk, or *because* Standard went bankrupt. *See, e.g., Transamerica Ins. Co. v. South,* 975 F.2d 321, 328–29 (7th Cir.1992) (malpractice plaintiff suing insurance broker on grounds that broker had placed coverage with an insurer who turned out to be insolvent).

Put another way, there were at least two "causes" for the Frontier suit: Standard's bankruptcy and Conestoga's malpractice. Although Standard's bankruptcy was a necessary predicate to the suit, because without it there would have been no default for Frontier to cover, the malpractice is, at a minimum, *a* proximate cause. Therefore, under California law as articulated in *Garvey,* the suit must be covered by Conestoga's liability insurance policy. It may well be unrealistic to deem Exclusion L "ambiguous" simply for failing to specify the degree of proximate causation required in order to trigger the duty to defend, but, in any case, California law fills in the gap where the text of the policy did not.

## IV.  CONCLUSION

We hereby reverse the district court's grant of summary judgment on the breach of contract and declaratory judgment claims. We vacate the district court's grant of summary judgment on the breach of good faith and fair dealing claim and remand to the district court for reconsideration in light of this opinion.

**REVERSED IN PART, VACATED IN PART, AND REMANDED.**