USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 96-1429 LINDA M. DANIELS-RECIO, Plaintiff - Appellee, v. HOSPITAL DEL MAESTRO, INC., ET AL., Defendants - Appellants. ____________________ No. 96-1686 LINDA M. DANIELS-RECIO, Plaintiff - Appellant, v. HOSPITAL DEL MAESTRO, INC., ET AL., Defendants - Appellees. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO [Hon. Raymond L. Acosta, Senior U.S. District Judge] __________________________ ____________________ Before Torruella, Chief Judge, ___________ Coffin and Campbell, Senior Circuit Judges. _____________________ _____________________ Mario Pab n-Rosario, with whom Jos Luis Gonz lez-Casta er ___________________ ____________________________ and Law Offices of Jos Luis Gonz lez-Casta er were on brief for __________________________________________ appellant SIMED. Kevin G. Little, with whom Law Offices David Efr n was on ________________ ________________________ brief for Linda Daniels-Recio. Edgardo A. Vega-L pez, with whom Jim nez, Graffam & Lausell _____________________ __________________________ was on brief for Asociaci n Hospital del Maestro and Evanston Insurance Company. ____________________ March 28, 1997 ____________________ -2- TORRUELLA, Chief Judge. On June 24, 1992, Linda TORRUELLA, Chief Judge. ____________ Daniels- Recio ("Daniels") filed a medical malpractice suit against Dr. Rafael S nchez-Monserrat ("S nchez") and Asociaci n Hospital del Maestro ("AHDM"), a hospital in San Juan, Puerto Rico. On November 2, 1992, Daniels amended her complaint to add Dr. S nchez' insurer, Sindicato de Aseguradores Para la Suscripci n Conjunta de Seguros de Responsibilidad Profesional M dico Hospitalaria ("SIMED"), and AHDM's insurer, Evanston Insurance Company ("Evanston"), as defendants. On January 17, 1995, AHDM and Evanston filed a motion for summary judgment. On March 30, 1995, the district court granted AHDM and Evanston's motion for summary judgment. In the meantime, on February 3, 1995, Daniels filed a motion in limine seeking determination of coverage under Dr. S nchez' insurance policy with SIMED. On February 28, 1996, the district court determined that Daniels' claim was covered by Dr. S nchez' policy, which had a stated limit of $500,000. The case was scheduled for trial. On March 15, 1996, following a settlement conference, Daniels, Dr. S nchez and SIMED entered into a Stipulation Agreement whereby they agreed that the district court would enter final judgment for Daniels in the amount of $500,000 in order for SIMED to appeal the district court's determination of policy coverage. We have before us SIMED's appeal from the final judgment, based on the district court's allegedly erroneous determination regarding policy coverage, as well as Daniels' -3- appeal from the district court's entry of summary judgment in favor of AHDM and Evanston. We affirm. BACKGROUND BACKGROUND As our review of the district court's grant of summary judgment is de novo, we present the background facts in the light __ ____ most favorable to the nonmovant, drawing all reasonable inferences in her favor. Dubois v. United States Dep't of ______ ________________________ Agriculture, 102 F.3d 1273, 1283-84 (1st Cir. 1996). ___________ In May 1989, after being admitted to AHDM's emergency room, Daniels was referred by AHDM staff to Dr. Regis-Bonilla, a pneumologist at Cl nica Las Am ricas. Daniels received treatment from Dr. Regis-Bonilla for approximately nine months, before he moved his practice to another city. After Dr. Regis-Bonilla left his San Juan practice, Dr. S nchez joined Cl nica Las Am ricas and began treating Daniels. In early 1990, Dr. S nchez diagnosed Daniels' condition as "silent asthma." On August 31, 1990, Daniels was again admitted to AHDM on an emergency basis. She was hospitalized until September 17, 1990. During this hospitalization, Dr. S nchez prescribed Medrol, an adrenocortical steroid, for the first time. Extended use of this medication can cause a number of adverse reactions, including hypertension, muscle weakness, steroid myopathy, osteoporosis, spinal compression fractures, abdominal distention, -4- development of a Cushingoid state,1 and manifestations of latent diabetes mellitus. Daniels was again admitted to AHDM on an emergency basis on October 5, 1990. After a consultation, Dr. S nchez took over as Daniels' primary attending physician. Hospital records showed that Daniels had been taking Medrol since her August 31 admission and that she had steroid myopathy as a complication of the steroid treatment. Daniels was discharged on November 1, 1990. On December 17, 1990, Daniels yet again was admitted to AHDM. Daniels had been taking Medrol since her last hospitalization and continued to take it throughout this stay. Steroid complications, specifically steroid-induced diabetes, were noted in her records. Daniels was discharged on December 31, 1990, with records showing that her "asthma" continued to be active and that she was taking Medrol upon her discharge. On May 30, 1991, Daniels was admitted to AHDM for a fifth time. She was still taking Medrol at the time of her admission and was continued on the medication during the course of her hospitalization. Several steroid related complications, including Cushing's syndrome, osteoporosis, spinal compression fractures, hypertension, and a decrease in height, were noted at the time of her admission. She was discharged on June 28, 1991.  ____________________ 1 Cushing's Syndrome is characterized by mood phases, excessive hair growth, increased bruisability, peripheral muscle atrophy, the formation of a pot belly and the formation of a "buffalo hump" on the afflicted person's back. -5- During each hospitalization, a series of respiratory function tests were run on Daniels. None of these tests indicated that she was having respiratory difficulty. Upon her last discharge, on June 28, 1991, Daniels was referred by Dr. S nchez to the National Jewish Center for Immunology and Respiratory Medicine ("National Jewish Center") in Denver, Colorado. Dr. S nchez' referral letter indicates that Daniels had been prescribed Medrol for the previous twelve months and that she was suffering from complications related to extended corticosteroid usage. On August 26, 1991, Daniels had her first appointment at National Jewish Center. At the time of this first visit, the staff at National Jewish Center questioned both Dr. S nchez' diagnosis of "silent asthma" and his treatment with Medrol for at least a year. The staff at National Jewish Center tapered Daniels' Medrol dosage and gave her a final dose on September 3, 1991, the day she was admitted to National Jewish Center. Doctors there discovered that her osteoporosis had developed to such an extent that her bone mass was approximately 70% of the normal level. The National Jewish Center staff diagnosed Daniels as suffering from breathing difficulties secondary to an anxiety disorder. Daniels was discharged from National Jewish Center on September 21, 1991. Daniels' experts indicated that the diagnosis of "silent asthma" was, at least ultimately, incorrect based on the objective respiratory test results. They further stated that a course of Medrol treatment extending beyond two weeks would -6- certainly result in the severe complications experienced by Daniels. DISCUSSION DISCUSSION In this diversity case, we apply Puerto Rico substantive law. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 92 ___ _____________ ________ (1938); Carota v. Johns Manville Corp., 893 F.2d 448, 450 (1st ______ _____________________ Cir. 1990). I. Policy Coverage I. Policy Coverage SIMED issued to Dr. S nchez a "claims made" medical malpractice insurance policy effective from July 7, 1991, to July 7, 1992. This policy limited liability to $500,000 per "medical incident" that occurred during the period of coverage, up to an aggregate of $1,000,000. The policy also had a retroactive component, which provided coverage to Dr. S nchez from July 2, 1986 to July 7, 1991. The retroactive portion of the policy provided coverage of $100,000 per "medical incident" that occurred during the retroactive period of coverage, up to an aggregate of $300,000. The question presented below and on appeal is when Daniels' "medical incident" occurred, which would determine which policy, and coverage limit, applied. SIMED claims the district court erred by determining that Daniels' "medical incident" spanned the coverage period of both policies2 and, thus, that Daniels' claim is covered by the  ____________________ 2 The policy language states: The Syndicate will pay on behalf of the Insured, with respect only to his practice within the Commonwealth of Puerto Rico: -7- subsequent policy, whose liability limit is $500,000. We find no error in the district court's determination. The policy language, including the language of the amendment, as set out in the margin, ties policy coverage to the timing of medical incidents.3 The district court properly framed the issue as follows: if the incident transcended the period of the lower policy coverage, that is, if Dr. S NCHEZ MONSERRAT'S rendering of, or failure to render professional services extended beyond the July 7, 1991 date, then the higher coverage would apply because all his acts or omissions, when taken together, comprise one  ____________________ All sums which the Insured shall become legally obligated to pay as damages because of injury to which this policy applies caused by medical incident . . . . Medical incident is defined as: [A]ny act or omission . . . in the furnishing of professional medical . . . services by the Insured. Any such act or omission, together with all related acts or omissions in the furnishing of such services to any one person shall be considered one medical incident. The Retroactive Date Amendment Endorsement II, which deals with retroactive insurance coverage in the amount of $100,000 per medical incident, states: Irrespectively of the retroactive date and the limits of liability shown in the Declarations Page of the above numbered policy, in consideration of the payment of the above stated premium, claims arising out of a medical incident which occurred between 7-02-86 and 7- 07-91 will be covered by this policy subject to a limit of liability of $100,000 per medical incident and an aggregate of $300,000. 3 Because the "event" triggering policy coverage is the timing of the medical incident, SIMED's repeated references in its brief to state and federal cases that reviewed policies in which the triggering event was the manifestation of the injury miss the mark. -8- medical incident pursuant to the policy definitions. Amended Order Granting Plaintiff's Motion in Limine and Setting Trial and Pretrial Settlement Conference, Feb. 28, 1996, at 2-3. Title 26, section 1114, of the Puerto Rico Civil Code governs the contents of insurance policies. In accordance with this provision, language in an insurance policy is to be construed according to the "most common and usual meaning, . . . paying . . . attention . . . to the general use and popular meaning of the idioms." Morales Garay v. Rold n Coss, 110 P.R.R. _____________ ___________ 909, 916 (1981).4 Moreover, "insurance contracts, being contracts of adhesion, are to be liberally construed in favor of the insured." Rivera v. Insurance Co. of Puerto Rico, 103 P.R.R. ______ ______________________________ 128, 131 (1974); see also P.R. Laws Ann. tit. 26, 1114(2) ________ (Supp. 1996) ("In the interpretation of said policies, the text that is of most benefit to the insured shall prevail."). The district court relied on the following facts in reaching its determination that the medical incident spanned both policies and, therefore, triggered coverage of the subsequent policy: 1. Insurance Company Progressive Report In the Progressive Report submitted to the Caribbean American Life Assurance Company, Dr. S NCHEZ MONSERRAT marked the box indicating "YES" to the question posed on the report which asked "Is patient still under your care for this condition?". He further informed that she had received a consultation from his office on August 4, 1991 and that  ____________________ 4 Page cites are to the Official Translation. -9- she was at the time in Colorado for "treatment." Significantly, the report is dated September 3, 1991, and is filled out in the doctor's own handwriting. 2. Pulmonary Questionnaire SIMED argues that the doctor's treatment of Ms. DANIELS ended on June 28, 1991, the date of her last hospitalization. It bases its belief on the Pulmonary Questionnaire prepared by Dr. S NCHEZ MONSERRAT, for submission to the Social Security Disability Determination Program. This form was filled out by the doctor on April 20, 1992, approximately seven months after the aforementioned insurance report was completed. Although on this questionnaire, the doctor indicates that "[Ms. Daniels was] not seen since June 28, 1991", it appears that the doctor's statements therein were made in reference to his last visit to the plaintiff at the hospital. A closer examination of page 3 of the questionnaire, requesting a listing of the office visits by the patient, reveals that the last entry for Ms. DANIELS was for May 30, 1991, the date that the doctor ordered her hospitalization, which hospitalization concluded on June 28, 1991. Thus, noticeably absent is the August 4, 1991, consultation which he had disclosed in the form filled out seven months earlier for the insurance company. Furthermore, in the aforementioned pulmonary questionnaire, the doctor indicated that Ms. DANIELS was "sent to the Jewish Institute of Allergy & Immunology--Aug. 26, 1991...." Since he was the doctor originating the referral to the Institute, this affirmation could be construed as another acknowledgment that Ms. DANIELS was still under his care and treatment at that time; clearly beyond July 7, 1991, the higher coverage date. 3. Admitted Facts-Pretrial Order Finally, though not less significant, the parties conceded in Part II, Admitted Facts of the Proposed Joint Pretrial Order filed on February 2, 1995 (docket No. 49) that Ms. DANIELS was a patient of Dr. RAFAEL -10- S NCHEZ MONSERRAT from May 21, 1990 until September 3, 1991. Id. at 3-5. We agree that these facts indicate that Dr. S nchez ___ continued to perform acts or omissions related to the furnishing of professional medical services to Daniels after July 7, 1991, thus triggering the subsequent policy, which provides coverage of $500,000 per medical incident. -11- II. Summary Judgment II. Summary Judgment We review the district court's grant of summary judgment de novo, and will uphold that determination "if the _______ record, viewed in the light most favorable to the nonmoving party, shows that 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Continental Ins. Co. v. Arkwright Mut. Ins. _____________________ ____________________ Co., 102 F.3d 30, 33 n.4 (1st Cir. 1996) (quoting Fed. R. Civ. P. ___ 56(c)). Faced with a properly documented motion, the nonmovant must establish the existence of a genuine issue of material fact in order to avoid the entry of an adverse judgment. Garside v. _______ Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990). _______________ Daniels attacks the district court's grant of summary judgment on various grounds, which we will consider in turn. A. Obvious malpractice A. Obvious malpractice Dr. S nchez' AHDM personnel records indicate that he maintained hospital privileges during the course of his treatment of Daniels. Under Puerto Rico law, a hospital's relationship with doctors to whom it grants hospital privileges must meet several requirements. The obligation that Daniels suggests AHDM failed to meet here, such that AHDM would be jointly and severally liable for Dr. S nchez' malpractice, requires hospitals to monitor the work of physicians with hospital privileges, and to intervene when possible in the face of an obvious act of medical malpractice. See M rquez Vega v. Mart nez Rosado, 116 ___ ____________ _______________ -12- P.R.R. 489, 500 (1985); see also Carlos J. Irizarry Yunqu , _________ Responsabilidad Civil Extracontractual 253 (1996). ______________________________________ Beyond her conclusory allegations to the effect that Dr. S nchez' malpractice was so obvious that AHDM staff should have intervened, Daniels fails to present sufficient facts to show that there is a "genuine issue for trial." LeBlanc v. Great _______ _____ American Ins. Co., 6 F.3d 836, 841-42 (1st Cir. 1993). Although __________________ Daniels directs our attention to the deposition testimony of her experts, all of whom agreed that the diagnosis of asthma was incorrect, none of this deposition testimony raises a genuine issue as to whether any act of malpractice by Dr. S nchez was so obvious that AHDM should have intervened. The only mention of "obviousness" in the deposition testimony comes from Dr. Harold Nelson, one of Daniels' experts. He states that Daniels' osteoporosis and her Cushingoid state were obvious symptoms of excessive corticosteroid use. That the symptoms Daniels exhibited after corticosteroid treatment were the obvious result of excessive use of the steroid does not sufficiently raise the issue of whether those symptoms were the obvious result of an act of malpractice. Daniels did not meet her burden of coming forward with concrete facts that would give rise to a genuine issue of material fact regarding AHDM's liability. B. Negligence of AHDM Staff Doctors and Nurses B. Negligence of AHDM Staff Doctors and Nurses Daniels next argues that the district court erred in finding that AHDM's doctors did not engage in malpractice. Daniels failed to press this contention before the district -13- court. Because Daniels' Opposition to Defendants' Motion for Summary Judgment fails to squarely raise any contention of specific malpractice on the part of AHDM's medical staff, we generally will not consider such an argument on appeal. See ___ Grenier v. Cyanamid Plastics, Inc., 70 F.3d 667, 678 (1st Cir. _______ _______________________ 1995) (recognizing that, by failing to present an argument in his opposition to summary judgment below, appellant failed to preserve the argument for appeal). Moreover, her argument is without merit. She premises AHDM's liability on the opinion of her expert, Dr. Alvarez, that AHDM staff members should have questioned Dr. S nchez' faulty diagnosis and that, had they done so, her result would have been different. Daniels misconstrues Dr. Alvarez' deposition testimony. Although Dr. Alvarez noted that nurses frequently question doctors' practices and that it did not appear that AHDM's nurses had questioned Dr. S nchez, immediately thereafter Dr. Alvarez stated that he had no opinion as to whether the nurses or hospital staff were negligent. This is hardly the forceful evidence of negligence that Daniels makes it out to be, and certainly does not raise a genuine issue as to whether AHDM's staff was negligent. C. Whether Dr. S nchez was an independent contractor C. Whether Dr. S nchez was an independent contractor Daniels contends that the district court misinterpreted our opinion in Su rez Matos v. Ashford Presbyterian Community ____________ _______________________________ Hosp., 4 F.3d 47 (1st Cir. 1993), when it found that AHDM was not _____ liable because Dr. S nchez was merely an independent contractor. -14- Daniels argues that under Su rez Matos, a hospital is liable when ____________ a negligent doctor is more than a mere "independent contractor having no other relationship with the hospital." Id. at 52. ___ Daniels takes this quotation out of context. The relevant quote reads: While strictly, perhaps, that decision [M rquez Vega v. Mart nez Rosado, 116 D.P.R. ____________ _______________ 489, 500 (1985)] contained dictum that we might distinguish, and certainly we need not adopt plaintiff[']s contention that it would impose liability in the case of an independent contractor having no other relationship with the hospital, it is clear here that granting staff privileges coupled with a joint sharing in profits, left the hospital fully responsible. Id. The Su rez Matos opinion, which applies to situations in ___ ____________ which the hospital has granted staff privileges to and engages in a profit-sharing relationship with a negligent physician to whom it refers a patient, did not discuss the situation Daniels presents here. Furthermore, the situation dealt with in Su rez Matos _____________ was markedly different from the case before us. There, the patient sought the assistance of the hospital on an emergency basis. Id. at 48. The following day, a uterine tumor was ___ removed and was examined by a pathologist on the hospital staff. Id. The pathologist misdiagnosed the tumor as benign. Id. By ___ ___ referring the tumor to the staff doctor, the hospital was, in effect, certifying the competence of that doctor. The same cannot be said of AHDM, which did not advise Daniels to seek treatment from Dr. S nchez. -15- Daniels further argues that Dr. S nchez was more than an independent contractor of AHDM and, thus, that AHDM is liable for his malpractice. Daniels misconstrues the application of Puerto Rico's independent contractor law. In M rquez Vega, the ____________ Puerto Rico Supreme Court visited this very issue: Under the second alternative -- where a person goes directly to a physician's private office, agrees with him as to the treatment he or she is going to receive, and goes to a given hospital on the physician's recommendation merely because said institution is one of several which the physician has the privilege of using -- the situation is somewhat different. Under this factual framework, the main relationship established is between the "patient" and the physician, while the relationship established between the patient and the hospital is of a supplementary and incidental nature. In this case, as a rule, the hospital should not be __________ held liable for the exclusive negligence of an unsalaried physician, who was first and foremost entrusted with the patient's health. 116 D.P.R. at 499 (emphasis in original); see also Carlos J. ________ Irizarry Yunqu , Responsabilidad Civil Extracontractual 252-53 _______________________________________ (1996). Daniels admitted in her deposition testimony that she relied primarily on Dr. S nchez for her diagnosis and treatment and "primarily entrusted [to him] the diagnosis and treatment of her respiratory condition." Deposition of Linda Daniels-Recio, July 26, 1993, at 113. She also indicated that she did not rely on AHDM's doctors or staff for diagnosis and treatment of her respiratory problems. Id. at 113-14. Finally, Daniels' ___ admissions to AHDM were at the instruction of Dr. S nchez, who was not a salaried employee of AHDM. These facts certainly fall -16- within the scope of the discussion in M rquez Vega, and AHDM ____________ cannot be held liable on a theory of independent contractor liability.5 Having addressed and found lacking all of Daniels' claims regarding the district court's direction of summary judgment in AHDM's favor, we affirm. CONCLUSION CONCLUSION For the foregoing reasons, we affirm the district affirm ______ court's determination of policy coverage and its grant of summary judgment in favor of AHDM and Evanston.  ____________________ 5 Indeed, the Puerto Rico Supreme Court stated that, in this situation, it is not the doctor, but the hospital that is the independent contractor: [T]he cited case [relied upon by the lower court] deals with the benefits derived by the principal from the work performed by the independent contractor. Under the alternative we are discussing now -- where the patient first goes to the physician and then to the hospital on the physician's recommendation -- the physician would be the principal and the hospital would then be the "independent contractor." M rquez Vega, 116 D.P.R. at 499. ____________ -17-