# United States Court of Appeals
## For the First Circuit

No. 10-1702

LÓPEZ & MEDINA CORP., d/b/a Emmanuel Travel & Tours,

Plaintiff, Appellant,

v.

MARSH USA, INC., as agent for certain subscribing and/or
participating insurance underwriters for Policies No.
AW823101, S1HL-200A, HL3391396-02, PXLA37000032-01, MMO2326AV501
and AAV01.440 issued to Patriot Air LLC, d/b/a Marsh Aviation;
PIEDMONT AVIATION SERVICES, INC., d/b/a Pace Airlines,

Defendants,

UNITED STATES AVIATION UNDERWRITERS, INC.,
as Managers of United States Aircraft Insurance Group &
Other Underwriters and Co-Insurers, Certain Underwriters
at the Institute of London, Certain Underwriters at Lloyd's,
AIG Aviation, Inc., Brockbank Underwriting Syndicate (U.K.),
Mutual Marine Office, AXA Equity and Law (U.K.), and
XYZ Insurance Company,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Juan M. Pérez-Giménez, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Stahl, Circuit Judges.

Fernando D. Castro-Maldonado, with whom Fernando D. Castro Law
Offices, was on brief for appellant.

     Christopher A. Duggan, with whom Smith & Duggan LLP, H. Reed
Witherby, Diego A. Ramos, and Fiddler González & Rodríguez, PSC,
were on brief for appellee.

_____

January 26, 2012

_____

**TORRUELLA, <u>Circuit Judge</u>**.  Plaintiff-appellant López & Medina Corp. ("L&M") appeals the district court's order denying its cross-motion for summary judgment.  The cross-motion was denied on the grounds that the insurance policy pursuant to which L&M sought coverage, issued by defendant-appellee United States Aviation Underwriters, Inc. ("USAUI"),[1] did not cover L&M's losses arising from an alleged breach of contract.  <u>López & Medina Corp.</u> v. <u>Marsh USA, Inc. et al.</u>, 694 F. Supp. 2d 119 (D.P.R. 2010).  We affirm the decision of the district court.

In addressing whether USAUI's policy covered L&M's contractually based claim, we tread on virgin ground in our circuit.  We have not yet had the opportunity to address whether the phrase "legally obligated to pay as damages" in a commercial general liability ("CGL")[2] policy, which usually covers only tort claims, also provides coverage for claims in an underlying action arising out of and related to a contract between the parties.  In resolving this matter of first impression, we join the majority of

---

[1]  The underlying policy was purchased in the aviation insurance Lloyd's of London market through USAIG and several other underwriters and co-insurers, to be managed by appellee USAUI.  For simplicity's sake, we will refer to those entities named as defendants throughout the course of this action as "USAUI" or "defendant co-insurers."

[2]  The acronym "CGL" is a common term used in the insurance industry to refer to comprehensive general liability.

those circuit courts of appeals that have ruled on the issue.[3] We thus hold that the policy in this case covers only liability arising in tort and does not provide coverage for liability arising from a breach of contract.

## I.   **Background**

### A.   **Factual Background**

On September 1, 2001, USAUI and other defendant co-insurers issued Airline Insurance Form PA-01, Policy #SIHL1-200A (the "Policy") to Pace Airlines, Inc. ("Pace").[4]  Pace was the "Named Insured" under the Policy, and two Boeing 737-200 aircraft were listed as the insured subjects.  The Policy covered certain risks assumed by its insured, Pace, in its contractual arrangements with other companies, which generally consisted of charter programs.

That same month (September 10, to be precise), Pace entered into one such charter program contractual arrangement. Pace signed an Aircraft Charter and Management Agreement ("Charter Agreement") with Patriot Air, LLC ("Patriot").  Pursuant to this agreement, Pace, as a direct air carrier, leased to Patriot, an

---

[3]  See Data Specialties, Inc. v. Transcon. Ins. Co., 125 F.3d 909 (5th Cir. 1997); Stanford Ranch, Inc. v. Md. Cas. Co., 89 F.3d 618 (9th Cir. 1996); see also Nationwide Mut. Ins. Co. v. CPB Int'l, Inc., 562 F.3d 591 (3d Cir. 2009); VBF, Inc. v. Chubb Group of Ins. Cos., 263 F.3d 1226 (10th Cir. 2001).

[4]  Pace's actual business name is the Carlyle Group and/or Piedmont Aviation Services, Inc., d/b/a Pace Airlines.

indirect air carrier, certain of its Boeing 737 aircraft for use in Patriot's charter flight operations.

Thereafter, on May 15, 2002, Patriot entered into a Passenger Aircraft Agreement ("Passenger Agreement") with L&M. Pursuant to this agreement, Patriot, acting as an indirect air carrier, agreed to provide L&M with aircraft transportation (specifically, the Boeing 737 aircraft leased from Pace) to transport L&M customers to destinations that L&M had booked on the travelers' behalf.[5] In return, L&M agreed to "submit a schedule of Flights to Patriot . . . forty-five (45) days prior to the month in which the Flights are to occur." Additionally, L&M agreed to make

_____

[5]  Because our assessment of insurance law in this case also requires us to traverse certain areas of aviation law, we define at the outset the following relevant terms for purposes of this opinion: charter flight, public charter, direct air carrier, indirect air carrier, and sub-operator.

  1.  A charter flight is "a flight operated under the terms of a charter contract between a direct air carrier and its customer." 14 C.F.R. § 380.2.
  2.  A public charter is "a one-way or round-trip charter flight to be performed by one or more direct air carriers that is arranged and sponsored by a charter operator."  Id.
  3.  A direct air carrier (in this case, Pace) is "a certificated commuter or foreign air carrier . . . that directly engages in the operation of aircraft under a certificate, authorization, permit or exemption issued by the Department."  Id.
  4.  An indirect air carrier (here, Patriot) is "any person who undertakes to engage indirectly in air transportation operations and who uses for such transportation the services of a direct air carrier."  Id.
  5. A sub-operator (here, L&M) is a "Public Charter operator that has contracted for its charter seats from a Public Charter operator that has contracted from one or more direct air carriers.  A sub-operator is itself an indirect air carrier, not an agent of the Public Charter operator from which it has obtained its seat."  Id.

advance deposits in Patriot's escrow account "[e]ach Friday during the term of this Agreement" in "an amount that is equal to the scheduled flight hours multiplied by $4,950 for the Applicable Period."  It also agreed "to pay Patriot at least $643,500.00 per month during the term of this Agreement . . . even if Charterer cancels flight(s)."  Lastly, before any of the scheduled flights took place,[6] Patriot required L&M to provide a surety bond in the amount of two hundred thousand dollars to ensure L&M's performance under the Passenger Agreement; L&M purchased the surety bond from United Surety and Indemnity Company for fifty thousand dollars.

With all matters seemingly finalized, Patriot and L&M prepared for their business venture, titled "Dream Air operated by Pace Airlines," to take off.  On June 22, 2002, the first chartered flight left Luis Muñoz Marín International Airport, departing from San Juan, Puerto Rico to the Dominican Republic.  Business seemingly continued to soar into early July, with additional flights occurring on July 3, 4, 7, 8, 11, 12, and 14 of 2002. However, it was not long before L&M and Patriot's business arrangement began to experience turbulence.

Between June and July 2002, L&M and Patriot exchanged various communications, in which L&M claimed that Patriot had unlawfully refused to provide aircraft for already scheduled

---

[6]  The first scheduled charter flight under the Passenger Agreement initially was scheduled for June 1, 2002.  The first flight did not actually take place until June 20, 2002.

-6-

flights, and Patriot contended that L&M had unlawfully failed to fulfill its payment obligations under the Passenger Agreement. As of mid-July, L&M and Patriot's Dream Air operation had become a business venture nightmare. By July 18, 2002, Patriot had taken action and terminated the Passenger Agreement.

Two months later, Patriot filed for voluntary bankruptcy under Chapter 11 in the United States Bankruptcy Court for the Northern District of Texas. L&M filed a proof of claim against Patriot for the former's incurred costs and suffered damages resulting from the latter's alleged breach of the Passenger Agreement and failure to provide chartered aircraft to L&M's booked passengers. The bankruptcy court subsequently disallowed L&M's claim against Patriot after the Chapter 11 proceedings were converted to a Chapter 13 liquidation. The bankruptcy judge confirmed a plan of liquidation on May 25, 2004, and all bankruptcy proceedings were terminated on August 31, 2004.

## B. Procedural History

On June 3, 2005, L&M filed the complaint in this action against Patriot and Pace's insurers (specifically, USAIG and its co-insurers, including USAUI, the manager of the Policy).[7] L&M

---

[7] L&M was able to sue USAIG and its co-insurers by virtue of Patriot's contractual agreement with Pace, the latter of which was insured for its charter operations for and on behalf of Patriot Air. Specifically, and as discussed infra, Pace (the direct air carrier) was insured for conventional aviation risks and physical damages to the aircraft leased to Patriot (indirect air carrier), as well as for risks associated with third-party liabilities

claimed that Patriot not only had breached their Passenger Agreement, but also had terminated the agreement in bad faith as of July 2002. L&M noted that Patriot, which it did not name as a defendant, had filed for bankruptcy in September 2002; however, it contended that its claim against Patriot was covered by one or more insurance policies, including the USAUI-managed Policy now at issue, thus explaining its suit against the co-insuring defendants.

L&M alleged three causes of action in its complaint: (1) the named defendants were liable under Puerto Rico's Direct Action Statute, P.R. Laws Ann. tit. 26, § 2003,[8] for risks insured under the Policy; (2) declaratory judgment, establishing that one or more of defendants' insurance policies provided coverage for those risks associated with the breach of the Passenger Agreement, Charter Agreement, or any other agreements concerning Patriot and Pace's charter operations; and (3) a determination that the Policy insured against a breach of contract risk, and therefore, defendant-insurers were directly liable to L&M within the maximum limit of their combined policies for losses arising from the alleged breach, which L&M contended amounted to ten million dollars.

---

arising from Pace's airline operations with a charter program, like Patriot.

[8] Puerto Rico's Direct Action Statute permits third parties to bring an action against an insurer (or insurers) for claims covered under an insurance policy, without having to join the insured to the dispute.

On August 21, 2007, USAUI, on behalf of all defendants, filed a motion for summary judgment arguing that L&M's claims were precluded under the doctrines of res judicata and collateral estoppel; that Puerto Rico's Direct Action Statute did not permit a claim against an insurer (here, defendants) if the claim no longer existed against the insured (here, Patriot); and that the Direct Action Statute did not apply extraterritorially to USAUI's actions in Puerto Rico. The court ultimately denied the motion, rejecting USAUI's arguments that L&M's claims were unavailable under either preclusion doctrine, or that the Direct Action Statute was inapplicable to the dispute.

USAUI subsequently requested that the district court certify for interlocutory appeal the question of whether coverage even applied under the Policy to the breach of contract claim that (USAUI contended) was alleged in L&M's complaint. Although the district court granted defendants the opportunity to file a motion explaining why certification as to this issue was appropriate, defendants elected instead to file a supplemental memorandum of law on the issue of coverage. Specifically, defendants requested that the district court dismiss the case with prejudice because the undisputed facts (namely, the plain language of the Policy) showed that the Policy did not cover L&M's alleged breach of contract claim, regardless of whether a breach of contract ultimately was or was not established.

L&M responded by filing a cross-motion for summary judgment, which USAUI opposed. In its cross-motion, L&M argued that the Policy's coverage expressly applied to its underlying claims for damages arising from Pace and Patriot's failure to provide air transportation, as contractually required, to its passengers. Specifically, L&M distinguished between those risks which it contended were inapplicable to its claims, including aviation risks and physical damages to the insured aircraft and listed in "Part II - Physical Damages" of the Policy, and those risks to which it asserted coverage applied. These allegedly coverage-applicable risks were listed in "Part I - Liability Coverage" of the Policy, or the CGL provision. L&M described these latter risks as "third-party liabilities arising from Pace's insured Airline Operations (i.e. non-owner, or aircraft charterer, third-party liabilities) as said term is defined in the Policy." L&M asserted that the Policy's clear language both identified and distinguished third-party liability risks, including contractual liabilities ("offenses"), from the aviation risks ("occurrences") for which it claimed coverage did not apply.

The district court rejected L&M's motion, concluding that the Policy "clearly and unambiguously does not provide coverage for a breach of contract claim." López & Medina, 694 F. Supp. 2d at 122. In brief, the district court carefully reviewed the Policy's plain language, relevant insurance treatises, and case law;

-10-

concluded that, pursuant to Puerto Rico insurance law and contract law, it could not consider extrinsic sources because the contested Policy language contained no inherent ambiguity; and found that the CGL language at issue only applied to "(1) tort claims, (2) for personal injuries, (3) arising out of Pace's refusal of transportation, (4) for offensive or wrongful reasons, such as discriminatory animus."[9] Id. at 126.

The district court also rejected L&M's subsequent re-framing of its argument in its Motion to Alter or Amend Judgment under Rule 59(e) and 60(b), for Amended and Additional Findings of Fact under Rule 52(b), and for Judgment as a Matter of Law under Rule 50(b) on the Issue of Insurance Coverage. In this motion, L&M asserted that the Policy covered "concomitant tort damages" arising from the alleged breach of contract, which L&M claimed were covered under the Policy. The district court again noted that neither in its complaint nor in its cross-motion for summary judgment had L&M alleged a tort violation, instead basing its claim entirely on Patriot's failure to fulfill contractually required obligations to provide air transport. Additionally, the district court noted that

[9] The district court also addressed (and L&M again raises the issue on appeal) whether the Charter Agreement constituted an "Approved Contract" under the language of the Policy, providing an exception to the Policy's exclusion of contractual liability. López & Medina, 694 F. Supp. 2d at 129-30. Having concluded that the Policy does not provide coverage for L&M's claim, we need not reach this issue, and thus do not address the district court's analysis on this matter.

L&M's alleged losses were economic in nature and concerned the related value of completed performance under the agreement, both of which sounded in contract. Lastly, the district court clarified that the Policy's listed tortious offense of "refusal or withholding of transportation" concerned an offense against a natural person, like a ticketed passenger, and not a corporation, like Patriot or L&M, further confirming that under no reasonable interpretation of the Policy's language could coverage be deemed applicable to L&M's claim.

L&M now appeals, arguing that the district court erred when it determined that the scope of the Policy's CGL coverage for Personal Injury was limited to tort claims.[10] Mindful that we face a matter of first impression for this circuit, we proceed down the rabbit hole.

## II.  Discussion

### A. Standard of Review

Summary judgment is properly granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

---

[10]  L&M additionally raises the following arguments on appeal, namely, that the district court: (1) erred in concluding that the Charter Agreement was not an "Approved Contract" under the Policy; (2) improperly failed to consider the Certificate of Insurance as further evidence of coverage; and (3) erred in rejecting L&M's expert's opinion regarding how to interpret coverage under the Policy.  Because we agree with USAUI's position that the Policy does not provide coverage for L&M's claims, as explained infra, we need not address these issues.

Civ. P. 56(a). We review the district court's grant of summary judgment de novo, Specialty Nat'l Ins. Co. v. OneBeacon Ins. Co., 486 F.3d 727, 732 (1st Cir. 2007), and the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in its favor, Daniels-Recio v. Hosp. del Maestro, Inc., 109 F.3d 88, 89 (1st Cir. 1997). "The presence of cross-motions for summary judgment neither dilutes nor distorts this standard of review." Mandel v. Bos. Phoenix, Inc., 456 F.3d 198, 205 (1st Cir. 2006).

Additionally, because "[t]he construction of an insurance policy is a question of law, . . . the legal conclusions of the district court are . . . not binding on the court of appeals." Nieves v. Intercont'l Life Ins. Co. of P.R., 964 F.2d 60, 63 (1st Cir. 1992). Thus, we "may make an independent examination of an insurance policy." Id. We review de novo the question of whether an insurance contract is ambiguous. Lloyd's of London v. Pagán-Sánchez, 539 F.3d 19, 22 (1st Cir. 2008); see also Lexington Ins. Co. v. Gen. Accident Ins. Co. of Am., 338 F.3d 42, 46 (1st Cir. 2003) ("[A] trial court's interpretation of an insurance contract is equally subject to de novo review.").

**B. Insurance Policy Construction Under Puerto Rico Law**

Puerto Rico law governs this diversity case. See Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938); see also Daniels-Recio, 109 F.3d at 90. Pursuant to such law, we must first turn to the

-13-

Insurance Code of Puerto Rico ("Insurance Code") as our guide on the path to interpreting the underlying insurance contract. See P.R. Laws Ann. tit. 26, §§ 101 et seq.; Nieves, 964 F.2d at 63; Jiménez v. Triple S. Inc., 154 F. Supp. 2d 236, 238 (D.P.R. 2001). Article 11.250 of the Insurance Code states that every insurance contract "shall be construed according to the entirety of its terms and conditions as set forth in the policy, and as amplified, extended, or modified by any lawful rider, endorsement, or application attached to and made a part of the policy." P.R. Laws Ann. tit. 26, § 1125.

Where the Insurance Code fails to provide an interpretative approach for a given situation, we also may turn to the Civil Code as a supplemental source of law. Nieves, 964 F.2d at 63 (citing P.R. Hous. Bank v. Pagán Ins. Underwriters, 11 Offic. Trans. 3, 8 (1981), 111 P.R. Dec. 1, 6). "Article 1233 of the Puerto Rico Civil Code provides that when the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed." Id. (quoting P.R. Laws Ann. tit. 31, § 3471) (internal quotation marks omitted). "[A] term is considered 'clear' when it is sufficiently lucid to be understood to have one particular meaning, without room for doubt." Jiménez, 154 F. Supp. 2d at 238 (quoting Hopgood v. Merrill Lynch, Pierce, Fenner & Smith, 839 F. Supp. 98, 104 (D.P.R. 1993)) (internal quotation marks omitted).

-14-

On the other hand, where a policy's language is unclear, we must construe the provisions against the insurer. Great Am. Ins. Co. v. Riso, Inc., 479 F.3d 158, 162 (1st Cir. 2007). We deem ambiguity present in a policy if a word or phrase is reasonably susceptible to more than one construction. Id. at 163 (stating that "[t]he ambiguities canon applies only where the policy can reasonably be read two ways, and the touchstone of coverage is expectation of protective insurance reasonably generated by the terms of the policy" (internal quotation marks and citation omitted)).

We lastly note that insurance contracts generally are viewed as adhesion contracts under Puerto Rico law, requiring liberal construction in favor of the insured. Fajardo Shopping Ctr., S.E. v. Sun Alliance Ins. Co. of P.R., Inc., 167 F.3d 1, 7 (1st Cir. 1999) (citing Quiñones López v. Manzano Pozas, 96 J.T.S. 95, at 1306, P.R. Offic. Trans. RE-91-567, slip op. at 10, 1996 WL 499244 (P.R. June 25, 1996)). However, we are cognizant that where a contract's wording is explicit and its language unambiguous, the parties are bound by its clearly stated terms and conditions, with no room for further debate. Nieves, 964 F.2d at 63; see also Vulcan Tools of P.R. v. Makita U.S.A., Inc., 23 F.3d 564, 567 (1st Cir. 1994) (where no doubt or ambiguity lies amidst the meaning of a contract's terms, "the court cannot dwell on the 'alleged' intent of the parties at the time they entered into the contract."

-15-

(quoting Hopgood, 839 F. Supp. at 104) (internal quotation marks omitted)).

## C. Whether the Policy Extends Coverage to L&M's Claims

L&M's essential argument on appeal is that the Policy -- in contrast to the district court's finding -- is not limited solely to tort claims, but instead covers both contract and tort actions.[11] Thus, L&M's claims also must be covered under the Policy. Because our analysis centers on the Policy's language, which serves as the best evidence of the parties' intentions, we address the relevant terms of the CGL provision. However, we begin our analysis by examining L&M's claims, for we cannot adequately consider whether the Policy covers L&M's claims without first understanding their actual nature.

### 1. L&M's Claims

A careful review of L&M's pleadings, motions, and arguments on appeal establishes that L&M's allegations against USAUI -- based on L&M's asserted damages for Patriot's alleged failure to provide chartered air transport via Pace -- sound in

---

[11] Specifically, L&M's brief contends that "[t]he District Court erred in limiting the allegations in the Complaint to a single breach of contract claim, determining that the scope of the aviation Policy's [CGL] insurance coverage for Personal Injury can only apply to 'tort' actions." Although L&M's brief does not clearly articulate whether its main source of contention is that (1) its claims are not limited to a contract action but also are tort-based, or (2) the Policy is not limited solely to tort actions, L&M's counsel clarified during oral argument that its true dispute lay with the district court's interpretation of the Policy's scope as being applicable solely to tort claims.

-16-

contract.  For example, in its complaint, L&M repeatedly alleges that indirect air carrier Patriot (which leased aircraft from direct air carrier Pace) breached its written Passenger Agreement with L&M by (1) failing to provide aircraft for a charter air travel program, and (2) unilaterally terminating the contract approximately two months following its execution.  See L&M Compl. ¶¶ 20-29, 32, 34, & 37-38; L&M Compl. Prayers for Relief ¶¶ 1-2. L&M similarly argues in its cross-motion for summary judgment that Patriot breached its Passenger Agreement with L&M and therefore coverage for L&M's resulting losses should extend to L&M under the Policy.  See L&M Cross-Motion for S.J. at 4, 5, 11, 12, 13 & 14. Indeed, L&M specifically states in its cross-motion that "Plaintiff's allegations are precisely based on Pace's and/or Patriot's sudden wrongful failure to provide air transportation to third-party, L&M, as contracted," id. at 4 (emphasis added), and that the Policy "expressly contemplates Pace's assumption of Patriot's contractual liability" in its coverage for "approved contracts," id. at 7 (emphasis added).

L&M's arguments on appeal -- generally, that the district court improperly limited L&M's allegations to a breach of contract claim, despite defendants' tortious act of refusing or withholding of transportation -- do little to persuade us otherwise as to the

-17-

contractual nature of its claim.[12]  Without belaboring the point,

L&M repeatedly asserts in its complaint that Patriot breached its

contractual obligations to L&M, and that such breach and its

resulting losses are covered under the Policy.  L&M Compl. ¶¶ 20-

29, 32, 34, & 37-38; L&M Compl. Prayers for Relief ¶¶ 1-2.  L&M's

alleged losses in the complaint are economic and concern the value

---

[12]  L&M additionally raised the following supporting arguments:
(1) Puerto Rico's Direct Action Statute "makes no expression as to
contractual or extra-contractual distinctions as pre-requisites"
for an action under the statute against the insurer, and thus, the
court's "pre-qualification, and mislabeling" of L&M's direct action
as contract-based was improper; and (2) although the district court
initially acknowledged a "distinction" between the instant action
and L&M's breach of contract action for damages against Patriot in
the Texas Bankruptcy Court, it subsequently failed to appreciate
the underlying (and unstated on appeal) differences between the two
actions.  We respond in brief.

  For an injured party to successfully pursue a claim against an
insurer under the Direct Action Statute, there still must be
coverage under the policy for the alleged losses.  See Torres-
Troche v. Municipality of Yauco, 873 F.2d 499, 502 (1st Cir. 1989)
(stating that an insurer "has no liability [under the Direct Action
Statute] unless there is a loss covered by the policy held by the
[insured]").  Because, as discussed infra, we agree with the
district court's conclusion that L&M's claims are not covered under
the Policy, L&M's contention as to the Direct Action Statute's
relevance regardless of the "contractual or extra-contractual"
nature of its claims holds little water.

  Second, it is clear that the initial distinction the district
court drew in its first order, and to which L&M refers, largely
rests upon the fact that the defendant in the bankruptcy action (in
contrast to the current action) was a different entity, with L&M
raising actions against an insured (Patriot) in one instance, and
against an insurer (USAUI) in another.  See López & Medina v.
Marsh, USA, Inc. et al., No. 05-1595, slip op. at 7 (D.P.R. Sept.
22, 2009).  Thus, the court's conclusion that the underlying facts
and allegations in each action would be "similar," but certainly
not "identical," stands to reason.

-18-

of completed performance under the contested contracts, namely, the Passenger and Charter Agreements. Lastly, the complaint's very caption frames the action as contractual in nature, stating: "Action for Declaratory Judgment, Direct Action Statute, Breach of Contract and Monetary Damages." At no point in the complaint does L&M ever clearly or expressly assert a tort violation, and it is not our role to sift through the tea leaves to predict additional claims that might be imbedded amongst those specifically alleged. See Schneider v. Local 103 I.B.E.W. Health Plan, 442 F.3d 1, 3 (1st Cir. 2006) ("Judges are not expected to be mindreaders." (quoting United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (internal quotation marks omitted)).

There can be no doubt that L&M's allegations here sound in contract, and L&M fails to establish otherwise in its arguments on appeal. Thus, in order for L&M to receive coverage under the Policy, it must establish that the Policy's coverage extends to contract-based claims. To the Policy we go.

## 2. Relevant Policy Terms

L&M directs us to specific provisions in the Policy which it alleges support its claim of coverage. Specifically, there are two main sources of coverage that L&M contends are relevant to our interpretation of the Policy. The first (and uncontested) type of coverage is that listed under "Part II - Physical Damages," which extends coverage to Pace for conventional aviation risks and

-19-

physical damages to the insured aircraft.[13]   The second (and contested) form of coverage is that provided under "Part I - Liability Coverage," also referred to by the parties as the "CGL provision."   L&M directs us to the following CGL language:

> 1.   COVERAGE
> The INSURER will pay on behalf of the INSURED all sums which the INSURED shall become legally obligated to pay as damages arising out of the Named Insured's Airline Operations because of:
> . . .
> B. PERSONAL INJURY arising out of one or more of the following offenses committed during the policy period;
> . . .
> Group 3.[14]   - Refusal or withholding of transportation or other public accommodation; but coverage hereunder shall not apply to payments made by the Insured under the provisions of its tariffs or contract of carriage, to persons holding confirmed reserved space on a flight and who are denied boarding on such flights whether such space is relinquished voluntarily or involuntarily.[15]

Furthermore, L&M, throughout its various pleadings and motions, has relied on the following specific language within the CGL provision to support its position that L&M suffered damages due to Patriot's allegedly bad faith failure to provide air transportation to L&M in

---

[13]   L&M concedes that the coverage provided for under "Part II - Physical Damages" is "inapplicable to plaintiff's claims."

[14]   The Policy lists seven "groups" of offenses that fall within the scope of the CGL provision's "Personal Injury" section, to be discussed infra.

[15]   We will refer interchangeably to this section of the Policy as the CGL provision, Subpart I.B, or the "Personal Injury" section of the Policy.

violation of their contractual agreement, and that the Policy extends coverage to such damages:

> The insurer will pay on behalf of the insured all sums which the insured shall become <u>legally obligated to pay as damages</u> arising out of the Named Insured's Airline Operations because of . . . personal injury arising out of . . . refusal or withholding of transportation or other public accommodation.

(Emphasis added).

We address the relevant language of the CGL provision.

### a. "Legally Obligated to Pay as Damages"

The circuit courts of appeals that have ruled on the interpretation of the phrase, "legally obligated to pay as damages," in a CGL provision have all held that it applies to tort and not contractual liability. See <u>Data Specialties, Inc.</u> v. <u>Transcon. Ins. Co.</u>, 125 F.3d 909, 911 (5th Cir. 1997) ("[T]he CGL policy language 'legally obligated to pay as damages' applies only to tort-based obligations."); <u>Smith Mailer Mfg.</u> v. <u>Lib. Mut. Ins. Co.</u>, 119 F.3d 7, 1997 WL 407862, at *3 (9th Cir. 1997) (unpublished table decision) ("California courts have consistently interpreted [the "legally obligated to pay as damages"] language to cover only tort liabilities and not those liabilities arising in contract." (quoting <u>Stanford Ranch, Inc.</u> v. <u>Md. Cas. Co.</u>, 89 F.3d 618, 624 (9th Cir. 1996) (internal quotation marks omitted)); <u>see also</u> <u>Nationwide Mut. Ins. Co.</u> v. <u>CPB Int'l, Inc.</u>, 562 F.3d 591, 597-98 (3d Cir. 2009) (addressing the phrase "legally obligated to pay" in

-21-

a CGL policy and noting that "Pennsylvania law does not recognize the applicability of a general liability policy to breach of contract . . . claims," and that "[t]he purpose and intent of a general liability insurance policy is to protect the insured from essentially accidental injury to the person or property of another rather than coverage for disputes between parties to a contractual undertaking" (citations and internal quotation marks omitted)); VBF, Inc. v. Chubb Grp. of Ins. Cos., 263 F.3d 1226, 1231 (10th Cir. 2001) ("The phrases, 'legally obligated to pay' and 'liability imposed by law' refer only to tort claims and not contract claims.").

Other state and federal courts similarly echo that a CGL provision, such as that at issue here, generally applies to tort, and not contract, claims. See, e.g., Keystone Filler & Mfg. Co., Inc. v. Am. Mining Ins. Co., 179 F. Supp. 2d 432, 439 (M.D. Pa. 2002) ("The purpose and intent of [a general liability] insurance policy is to protect the insured from liability for essentially accidental injury to the person or property of another rather than coverage for disputes between parties to a contractual undertaking." (alterations in original) (citations and internal quotation marks omitted)); Hartford Accident & Indem. Co. v. A.P. Reale & Sons, Inc., 644 N.Y.S.2d 442, 443 (N.Y. App. Div. 1996) ("[T]he purpose of a [CGL] policy . . . is to provide coverage for tort liability . . . and not for contractual liability of the

-22-

insured for economic loss . . . ."); Wis. Label Corp. v. Northbrook Prop. & Cas. Ins. Co., 607 N.W.2d 276, 343 (Wis. 2000) ("A CGL policy is not a performance bond; it provides coverage for tort damages but not for economic loss resulting from contractual liability." (internal quotation marks omitted)); Action Ads, Inc. v. Great Am. Ins. Co., 685 P.2d 42, 45 (Wyo. 1984) (providing that liability insurance "encompasses liability which the law imposes on all insureds for their tortious conduct and not on the liability which a particular insured may choose to assume pursuant to contract").

Renowned insurance treatises and commentators also agree that the purpose of a CGL policy is to indemnify a party against tort and not contract-based liability. For instance, Couch on Insurance, considered one of the leading sources on insurance law, clearly states that CGL policies "are designed to cover an insured's tort liability, . . . [and thus] liability based upon contract is generally excluded from coverage." 7A Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 103:19 (3d ed. 2009); see id. § 129:4 ("A [CGL] policy is designed and intended to provide coverage to the insured for tort liability for physical injury to the person or property of others. A [CGL] policy is not intended to provide coverage for the insured's contractual liability which merely causes economic losses."). See also 1 Barry R. Ostrager & Thomas R. Newman, Handbook on Insurance Coverage Disputes, § 7.01,

at 469 (15th ed. 2010) ("[T]he purpose of a [CGL] policy . . . is to provide coverage for tort liability for physical damage to others and not for contractual liability of the insured for economic loss . . . ." (quoting Hartford Accident, 644 N.Y.S.2d at 443)); Jack P. Gibson et al., Commercial Liability Insurance, § V.D.6 (10th reprint 2006) ("While no coverage is intended for most two-party contractual obligations, the CGL policy is intended to cover one party's tort liability to another party, and the mere existence of a parallel contractual obligation between them should not prejudice this coverage."); 2 Jeffrey W. Stemple, Stemple on Insurance Contracts § 14.14[A], at 14-226 (3d ed. 2009) (stating that, generally, a liability insurance policy provides coverage for tort claims, not contract claims, and noting that the pleading of a breach of contract claim is "something uncovered").

Secondly, such trusted insurance resources have also widely accepted that the phrase, "legally obligated to pay as damages," refers exclusively "to the liability of the insured arising from the breach of a duty that exists independent of any contractual relationship between the insured and the injured party."  1 Ostrager & Newman, § 7.01 at 468 (emphasis added); see also 7A Couch at § 103:14 ("While the phrase 'legal liability' includes liability assumed by contract, the phrases 'liability imposed by law,' and 'legally obligated to pay as damages' do not.").

-24-

L&M's proposed interpretation of the Policy's CGL language as applicable to contract claims effectively asks us to view well-settled insurance law through the looking glass. It is generally not our role to contradict established, well-grounded law. Here, the well-beaten path does indeed make the right road, and we refuse to accept L&M's invitation to wander from it. Indeed, the upshot of extending coverage to a breach of contract claim in this instance would be to turn this CGL policy into a performance bond; we are unwilling to do so.

## III.  Conclusion

Finding no ambiguity in the Policy's clear language, we may enforce it according to its express terms, which, as previously stated, provide no coverage for L&M's contract-based claims.  See Nieves, 964 F.2d at 63.  We need not address L&M's other arguments, as they invite us to look outside the clearly delineated scope of the Policy to external documents and the parties' alleged intent when entering the agreement -- factors that are not relevant where a policy's language is unambiguous.  See Vulcan Tools of P.R., 23 F.3d at 567.

For the foregoing reasons, we affirm.

**Affirmed**.